```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   UNITED STATES OF AMERICA,        )   No. 19 CR 592-1
                                      )
 5                  Plaintiff,        )
                                      )
 6            v.                      )   Chicago, Illinois
                                      )   March 2, 2020
 7   JAVONTE STOKES,                  )   10:15 a.m.
                                      )
 8                  Defendant.        )   Suppression Hearing

 9
                     TRANSCRIPT OF PROCEEDINGS
10       BEFORE THE HONORABLE SHARON JOHNSON COLEMAN

11   APPEARANCES:

12   For the Government:       HON. JOHN R. LAUSCH, JR.,
                               United States Attorney, by
13                             MR. ALBERT BERRY, III
                               MR. COREY B. RUBENSTEIN,
14                             Assistant United States Attorneys
                               219 South Dearborn Street
15                             Suite 500
                               Chicago, Illinois  60604
16

17   For the Defendant:        MR. CARL P. CLAVELLI
                               1420 Renaissance Drive
18                                   Suite 213
                               Park Ridge, Illinois  60068
19

20

21

22
                  TRACEY DANA McCULLOUGH, CSR, RPR
23                    Official Court Reporter
                   219 South Dearborn Street
24                         Room 1232
                   Chicago, Illinois  60604
25                      (312) 435-5570
```

1              THE CLERK:  19 CR 592, USA versus Javonte Stokes.

2              MR. BERRY:  Good morning, Your Honor.  Albert Berry

3     and Corey Rubenstein for the United States.

4              MR. CLAVELLI:  Carl Clavelli for Mr. Stokes, who's

5     present.

6              THE COURT:  Hello, Mr. Stokes.

7              DEFENDANT STOKES:  Good morning.

8              THE COURT:  All right.  Good morning.  Are we ready

9     for a hearing?

10             MR. CLAVELLI:  Yes, Judge.

11             MR. BERRY:  The government's ready.

12             THE COURT:  All right.  And do we have witnesses?

13             MR. BERRY:  Yes.

14             THE COURT:  All right.  If you want to give me a

15    quick overview, you can.  I am very familiar with the facts,

16    and I read the documents.  Is there anything to --

17             MR. CLAVELLI:  You want me to do it real quick?

18             THE COURT:  Go ahead.  It's your motion.

19             MR. CLAVELLI:  I'll just do it real quick.  At about

20    2:30 in the morning on I think it's 86th Street, the car is

21    being driven by a Muslim man, who happens to be my client and

22    the rear seat passenger's supervisor.  He was taking them home

23    after work.  The police officers were coming from the opposite

24    directions.  They saw that the bright lights were on, and they

25    effected a traffic stop for the reason that you're supposed to

1  dim your lights when a car is approaching, and the driver did
2  not.
3          THE COURT:  Not to mention on 900 around Cottage
4  Grove at 76th you don't need to have highlights on usually.
5          MR. CLAVELLI:  You know, Judge, I -- that might not
6  be the right address.  I have to look in my file to see.
7          THE COURT:  Well, it was in the city.  Weren't we in
8  the city?
9          MR. CLAVELLI:  It's right next to Grand Crossing.
10 They were stopped right next to Grand Crossing Park.
11         THE COURT:  Okay.
12         MR. CLAVELLI:  Okay.
13         THE COURT:  Yes.
14         MR. CLAVELLI:  Just east of the Ryan.  900 block
15 east.
16         THE COURT:  That's Cottage Grove area.
17         MR. CLAVELLI:  Okay.
18         THE COURT:  Trust me.  All right.
19         MR. CLAVELLI:  I do, Judge.
20         THE COURT:  All right.
21         MR. CLAVELLI:  The driver rummaged around.  You can
22 see on the body camera.  He goes into his glove compartment.
23 He can't find his driver's license.  He's got a stack of
24 papers.  Apparently he does find his insurance card, but he
25 cannot find his driver's license.  So the police officers ask

1    him to step out of the car.  The police officer opens the

2    driver's door, and then you can see quickly on the tape that

3    when they get a few steps away, they handcuff the driver, hands

4    behind his back.

5         At this time nobody, nobody has gone to the police

6    car and looked up anybody on the computer.  There's a police

7    officer on each side of the car.  The police officer on the

8    passenger side --

9         THE COURT:  And the car is full?  And the car is

10   full?

11        MR. CLAVELLI:  The car is?

12        THE COURT:  Full?  There's passengers or just --

13        MR. CLAVELLI:  Oh.  One person in the back seat

14   behind the passenger.  My client's in the front passenger.  The

15   police officer tells my client to get out.  My client says no.

16   And the police officer opens the door somewhat violently, and

17   my client gets out, and you can see him facing the street.  And

18   the -- he's standing in the street.  The police officer's above

19   him.  And you can't see on the tape below the elbows, but, you

20   know, his arms are being pulled back and he's cuffed.  As he's

21   cuffed, my client runs away, and they arrest him.  The police

22   officers then proceed to search the car --

23        THE COURT:  As who was cuffed?  You said as he was

24   cuffed, or in the process of get -- somebody runs away.  The

25   way you made it sound like --

1          MR. CLAVELLI:  I went too fast?  I'm sorry.

2          THE COURT:  Yes, you went too fast.  Yes.

3          MR. CLAVELLI:  So he runs away.  He gets about

4    20 feet away.  They catch him and they cuff him.  And then they

5    get the passenger out of the back seat, a young girl.  And they

6    cuff her.  And then they proceed to search the car, including

7    the trunk.  And the legal, the legal --

8          THE COURT:  Including the trunk?  Including the

9    trunk?

10          MR. CLAVELLI:  The trunk.  And if you want the legal

11    issues, I can --

12          THE COURT:  No, I mean --

13          MR. CLAVELLI:  It's a --

14          THE COURT:  We can start.  I mean, I have read the

15    briefs.

16          MR. CLAVELLI:  All right.

17          THE COURT:  So unless something is missing, we can go

18    ahead and start with that as opposed to continuing.

19          MR. CLAVELLI:  The facts are not in -- I don't think

20    are going to be in horrible dispute.  Maybe here and there, but

21    not horribly.

22          THE COURT:  It's how the law applies.

23          MR. CLAVELLI:  I think it's a legal, a legal

24    question.

25          THE COURT:  All right.  Well, who do you have?

1  Government.

2          MR. BERRY:  May I, Your Honor.

3          THE COURT:  Yes.

4          MR. BERRY:  There's just a couple of factual things

5  I'd like to insert into, into this situation or things that

6  actually happened that the body cam will show and that the

7  evidence will show from the officers.  Mr. Clavelli is right,

8  the defendant is a passenger in a car that had its high beams

9  on.  As it approaches the officers, they see that.  They make a

10  U-turn, and they pull the vehicle over.  When they pull the

11  vehicle over, one officer approaches on the driver's side, one

12  on the passenger side.  The defendant is in the front passenger

13  side of the vehicle.

14          The officer, the officer's name is Tkachuk, he asks

15  the driver for his license and his insurance.  He also asked

16  whose bottle is that.  Counsel left that out.  There's a bottle

17  of alcohol, of Remy Martin that's sitting next to the defendant

18  in the passenger seat.  The defendant says it's mine.  Hands

19  the bottle over to the officer, and the officer places the

20  bottle on top of the car.  That possession of that alcohol --

21  the alcohol is about maybe one quarter -- the bottle is about

22  one quarter full.

23          THE COURT:  And open?

24          MR. BERRY:  And open.  Yes, Your Honor, it is an open

25  bottle of alcohol.

1          THE COURT:  That's the key point.

2          MR. BERRY:  Yes, it is, Your Honor.  As the driver

3  cannot find his license, the officer asked him to step out.

4  The officer does tell him that he's being detained and he's not

5  under arrest.  Brings him to the back of the car.  At that

6  point the partner, Officer Gomez does ask the defendant --

7          MR. CLAVELLI:  Well, I object to the officer tells

8  him he's not under arrest.  I object to that.

9          THE COURT:  Well, right now this is what he expects

10  the evidence to show.  If he doesn't show it, I'm not going to

11  consider it.

12          MR. CLAVELLI:  We do have a video.

13          THE COURT:  That's what I'm saying.

14          MR. CLAVELLI:  If it's there, it's there.

15          THE COURT:  If it doesn't -- whatever either one of

16  you is saying is not evidence.  You are summarizing for me.

17  They weren't going to do it at all until you did yours.  So go

18  ahead, Mr. Berry.

19          MR. BERRY:  Thank you, Your Honor.  As the, the

20  officer on the defendant's side of the car asked the defendant

21  to step out of the vehicle, the video will show and the officer

22  will testify the defendant said no and started to roll up the

23  window.  As that happened, the officer opened the door.  He did

24  pull his firearm, and he asked the defendant to step out of the

25  vehicle.  The defendant steps out of the vehicle, and as the

1  video will show, the defendant steps out of the vehicle, turns

2  and faces the vehicle with his hands in the air.  The officer

3  never touches him.

4          As the officer is holstering his firearm, the

5  defendant runs in one direction, causing officers to bump into

6  the police car.  He turns and runs in the other direction.  He

7  is tackled.  He is stopped.  At that point he's held there.

8  And the video -- you will see the video as to what the

9  questions they were asking him.  And the firearm that's

10  recovered is recovered from his front pants pocket.  Not from

11  the --

12          THE COURT:  His being?

13          MR. BERRY:  His being the defendant.

14          THE COURT:  Mr. Stokes.

15          MR. BERRY:  Mr. Stokes.  So the firearm was recovered

16  on his person on his front pants -- in his front right pants

17  pocket.  That's what the evidence will show, Your Honor.  There

18  are some legal things, but I just wanted to clear up the

19  factual basis there.

20          THE COURT:  All right.  We'll take a look.  I'll hear

21  the evidence.  All right.  Government, who are you putting on?

22          MR. BERRY:  Yes, Your Honor, we will call Officer

23  Tkachuk first.

24          MR. RUBENSTEIN:  Your Honor, one, one quick thing --

25          THE COURT:  Yes.

1    MR. RUBENSTEIN:  -- before we bring the first witness

2    in.  I tendered to counsel and I tendered to Your Honor, there

3    are a couple of additional cases that aren't cited in our

4    brief --

5            THE COURT:  Okay.

6            MR. RUBENSTEIN:  -- which I'd like to hand up.  Thank

7    you.

8        (Documents tendered.)

9            MR. CLAVELLI:  You know, Judge, we're a little tight

10   for time.

11           THE COURT:  Yes.  No, I'm not having him argue it.

12   We just --

13           MR. CLAVELLI:  We have four witnesses.

14           THE COURT:  We're going to go.

15           MR. CLAVELLI:  Okay.

16           THE COURT:  We already pushed the other one back a

17   little bit.

18           MR. CLAVELLI:  I just wanted to say, I haven't read

19   these cases, and I think a posttrial brief would be better than

20   trying to argue it.

21           THE COURT:  Well, who said the Court was going to

22   have you argue and rule today?

23           MR. CLAVELLI:  I'm just saying.

24           THE COURT:  Yes.  I didn't say that.

25           MR. CLAVELLI:  I'm not really not prepared.  I

Tkachuk - direct by Rubenstein

1    haven't read these cases.

2          THE COURT:  I didn't say that.  Yes, I'm just -- let

3    him give it to us.  All right.  We're going to start the

4    testimony, and we'll go from there.

5          MR. BERRY:  Thank you, Judge.

6          MR. CLAVELLI:  Thank you very much, Your Honor.

7          MR. RUBENSTEIN:  The government calls Officer Andrius

8    Tkachuk.

9          THE COURT:  Spell his name.

10          MR. RUBENSTEIN:  His first name is spelled

11    A-N-D-R-I-U-S.  Last name T, silent T, K-H-A-C-H-U-K.

12          THE COURT:  All right.  Thank you.

13    ANDRIUS TKACHUK, GOVERNMENT'S WITNESS, DULY SWORN

                   D I R E C T   E X A M I N A T I O N

14

15    BY MR. RUBENSTEIN:

16    Q    Officer, would you please just state your name for the

17    record.

18    A    First name Andrius, A-N-D-R-I-U-S.  Last name Tkachuk,

19    T-K-A-C-H-U-K.

20    Q    Officer Tkachuk, are you currently employed by the Chicago

21    Police Department?

22    A    I am.

23    Q    And how long have you been an officer with the Chicago

24    Police Department?

25    A    For more than three and a half years.

Tkachuk - direct by Rubenstein

1   Q    And, sir, are you assigned to a particular district in the

2   Chicago Police Department?

3   A    I am.  6th District.

4   Q    The 6th District.  And is that comprised of particular

5   neighborhoods of the City of Chicago?

6   A    It does.  It's, it's a district -- one of the districts on

7   the south side of Chicago.  Comprised of Gresham, Shannon Park,

8   and the east part of the district touches Grand Crossing Park.

9   Q    And is, is that district and are those neighborhoods

10  considered to be high crime areas by the Chicago Police

11  Department?

12  A    They are.

13  Q    I'm going to direct your attention to July --

14          THE COURT:  Objection sustained.  I don't call those

15  areas high crime areas.  Please move on.

16          MR. RUBENSTEIN:  Yes, Judge.

17          THE COURT:  Thank you.

18  BY MR. RUBENSTEIN:

19  Q    I'm going to direct your attention to July 7th of 2019.

20  Were you on duty on that date?

21  A    I was.

22  Q    And what was your shift like that date?

23  A    My shift I worked midnights.  It begins 21:00, which is

24  9:00 p.m.

25  Q    So you started at 9:00 p.m. on the 6th, and that spilled

Tkachuk - direct by Rubenstein

1  over till the early morning hours of the 7th?

2  A    It did, yes.

3  Q    And what was your particular assignment that day?

4  A    We were assigned to 641 Robert, which is a rapid response

5  car.  A mission vehicle.  Or a mission car, which is assigned

6  to different missions in the district which have spike in crime

7  at that particular -- like that particular time that week.

8  Q    And on that shift you were in an SUV marked vehicle, is

9  that right?

10 A    That's correct.  A Ford Explorer.

11 Q    Did you have a partner with you?

12 A    I did.

13 Q    Who was your partner?

14 A    Kevin Gomez.

15 Q    And who was the driver of the vehicle?

16 A    I was.

17 Q    And Officer Gomez was in the passenger seat, correct?

18 A    That's correct.

19 Q    During that shift at about 2:30 in the morning, did you

20 come to pull over a vehicle in which the defendant Javonte

21 Stokes was a passenger?

22 A    We did, yes.

23 Q    And defendant Stokes is sitting at counsel table here

24 today, correct?

25 A    That's correct.

Tkachuk - direct by Rubenstein

1  Q    Can you describe the events leading up to that traffic
2  stop.
3  A    We were traveling westbound on 76th Street passing up
4  Cottage Grove when I observed a four-door white sedan traveling
5  eastbound with high beams activated.
6  Q    And how did you, how did you conclude that that vehicle
7  had its high beams on?
8  A    When I first noticed the vehicle with the high beams on,
9  the beams were particularly bright to the point where it
10 actually made me look away so I could continue -- so I could
11 see my path in the direction where I was going.
12 Q    So you were traveling in the opposite direction of that
13 vehicle?
14 A    That's correct.
15 Q    What did you do once you observed that vehicle?
16 A    Once I observed the vehicle, I traveled a little bit west
17 and then made a U-turn to -- in an attempt to get behind the
18 vehicle.
19 Q    And were you then able to activate your emergency lights
20 and execute a traffic stop?
21 A    Yes.  After several blocks when it was a most opportune
22 time, when it was the safest time, I curbed the vehicle.  We
23 did activate our emergency equipment and conduct a traffic
24 stop.
25 Q    And the vehicle pulled over to the curb, and your car was

Tkachuk - direct by Rubenstein

1   behind that vehicle, is that right?

2   A    That's correct.

3   Q    And did you have your body worn camera on your uniform,

4   and did you activate it at the time of that traffic stop?

5   A    I did, yes.

6   Q    And did your partner do the same thing?

7   A    That's correct, yes.

8   Q    Have you recently reviewed those -- both of those videos?

9   A    We did.

10  Q    What did you do after you stopped that vehicle?

11  A    Once we stopped the vehicle, I approached the vehicle from

12  the driver side and made contact with the driver.

13  Q    And did Officer Gomez approach on the passenger side?

14  A    That's correct, he did.

15  Q    What happened when you made contact with the driver?

16  A    Once I made contact with the driver, I, I asked for proper

17  documentation.  A driver's license and insurance.

18  Q    Did you notice anything about the windows at that point?

19  A    The windows were tinted.  At which point I did ask the

20  driver to lower the passenger side window so my partner could

21  actually see inside the vehicle as well.

22  Q    And did the driver lower the windows as you requested?

23  A    Yes.

24  Q    What did you observe about any passengers in the vehicle

25  at that point?

Tkachuk - direct by Rubenstein

1  A    The defendant was seated in the front passenger, and there

2  was also another passenger in the right rear of the vehicle,

3  which was a female.

4  Q    And did you observe any, any other objects in the vehicle

5  at that point?

6  A    At that point I did observe a open bottle of alcohol in

7  the vehicle, yes.

8  Q    And where did you see that bottle?

9  A    The bottle was on the defendant's left side -- left leg

10 wedged between the center console and his left leg.

11 Q    And so it was to the defendant's left between the

12 defendant and the driver?

13 A    Correct.

14 Q    It was still in plain view of your view obviously,

15 correct?

16 A    Correct.

17 Q    Was it in plain -- could you tell was it in view of the

18 driver as well then?

19 A    That's correct.

20 Q    What, if anything, did you do once you saw that bottle?

21 A    At that point with my right hand, which was on top of the

22 vehicle, I motioned to my partner indicating that there's

23 presence of alcohol in the vehicle.

24 Q    And we're going to show the video in a couple minutes, but

25 can you just indicate what kind of signal you gave to your

Tkachuk - direct by Rubenstein

1  partner at that point.

2  A    I indicated with my right hand indicating like such,

3  (indicating).  Indicating that there's alcohol in the vehicle.

4  And then I pointed down, also indicating to my partner that the

5  alcohol is present inside at that immediate area.

6  Q    After you made that indication, did you make any request

7  of or make any inquiries of the passengers or the driver

8  regarding that bottle?

9  A    I did.  I asked the driver of the vehicle to pass me the

10  bottle.

11  Q    Did you, did you make any inquiries regarding who that

12  bottle belonged to?

13  A    I did.

14  Q    And was there any answer?

15  A    The defendant stated it was his.

16  Q    After the defendant indicated it was his bottle, you then

17  made the request to have that bottle passed to you?

18  A    That's correct.

19  Q    Okay.  And what did you do with the bottle at that point?

20  A    I placed it on top of the vehicle.

21  Q    And were you able to observe whether that was either a

22  sealed bottle of alcohol, or had been opened and unsealed?

23  A    It was partially empty.

24  Q    Okay.  And can you estimate how much liquid there was left

25  in that bottle?

Tkachuk - direct by Rubenstein

1   A    It was one fourth full.

2   Q    And were you able to observe what kind of alcohol brand it

3   was?

4   A    Remy Martin.

5   Q    At that point you had asked the driver for his driver's

6   license and insurance, is that right?

7   A    That's correct.

8   Q    And had the driver been able to produce either of those

9   documents immediately when you asked him for them?

10  A    Not immediately.

11  Q    What did you do at that point?

12  A    I -- once the driver failed to produce the documents I

13  asked him for, I requested him to step out of the vehicle.

14  Q    And did he step out right away, or did he continue to look

15  for documentation?

16  A    Not my -- he did not follow my initial request, but he

17  continued looking for the asked documents.

18  Q    And did you allow him some additional time?

19  A    I did.

20  Q    Was he then able to produce some kind of document to you?

21  A    He did.

22  Q    Was it his driver's license?

23  A    It was not.

24  Q    Do you recall exactly what the documentation was sitting

25  here today?

Tkachuk - direct by Rubenstein

1   A    I actually don't.

2   Q    Is it possible it was his insurance card?

3   A    It might have been, but I really don't recall.

4   Q    At that point did you ask the driver again to step out of

5   the vehicle?

6   A    I did.

7   Q    And did he comply?

8   A    At that point he did, yes.

9   Q    And what did you do once he stepped out?

10  A    Once the driver stepped out, I conducted a pat down just

11  for safety and put his handcuffs on him and told him that he's

12  not under arrest, but he's being detained.  And I took him to

13  the rear of the vehicle.

14  Q    And what were the circumstances that led you to handcuff

15  the driver at that point?

16  A    Well, the fact that he did not have a license.  And also

17  working at night, it was 2:30 in the morning, we're the

18  furthest east of the district that we are, it's only myself and

19  my partner.  There's three occupants in the vehicle.  It is,

20  you know, high -- pretty high crime area.  It's summertime.

21  Recent high, you know, spikes in crime.  So basically the

22  handcuffing is what we do just for safety reasons.

23  Q    And I think you said that you also mentioned to the

24  driver --

25           THE COURT:  Excuse me one second.  I'm sorry.

Tkachuk - direct by Rubenstein

1          MR. RUBENSTEIN:  Yes, Judge.

2          THE COURT:  The safety reasons were what?  Based on

3    everything that was going on, nothing he did?

4          THE WITNESS:  Well, he did not have his license.  So,

5    therefore, he failed to produce a license.

6          THE COURT:  Right.

7          THE WITNESS:  So at that point we had to verify

8    further if he has a valid license, suspended.  If he's allowed

9    to drive a vehicle.  So that's one of the options.  But we also

10   for safety reasons as well.

11         THE COURT:  All right.  Go ahead.

12   BY MR. RUBENSTEIN:

13   Q    In addition, it was 2:30 in the morning at that point?

14   A    Correct.

15   Q    And separate and aside from the safety reasons, you

16   mentioned he failed to produce a driver's license, in

17   addition --

18         THE COURT:  Counsel, I just asked him all that.  You

19   don't have to repeat it.

20         MR. RUBENSTEIN:  I was going to ask him about the

21   alcohol, Judge.

22         THE COURT:  Okay.  Let's get to the alcohol.

23         MR. RUBENSTEIN:  Okay.

24   BY MR. RUBENSTEIN:

25   Q    In addition, even though you had told the driver that he

Tkachuk - direct by Rubenstein

1  was currently being detained and not under arrest, based on the
2  open alcohol, was it your understanding that he could be placed
3  under arrest?
4  A    That's also correct.
5  Q    Okay.
6         THE COURT:  And when did the driver hear Mr. Stokes
7  tell you that it was his alcohol?  Before or after you took the
8  driver back in the back?
9         THE WITNESS:  That was before.
10         THE COURT:  Okay.  Proceed.
11 BY MR. RUBENSTEIN:
12 Q    Before the driver even got out of the car, is that right?
13 A    That's correct, yeah.
14 Q    What was your -- what, if anything, did you do after you
15 detained and handcuffed the driver?
16 A    I looked in my -- in the direction of my partner
17 indicating that the individual that I escorted to the rear of
18 the vehicle, he's secure and --
19         MR. CLAVELLI:  I'm sorry.  Indicating what?  I
20 couldn't hear.
21         THE COURT:  A little louder please, sir.  There you
22 go, yes.  Keep -- stay right there.  That's good.
23 BY MR. RUBENSTEIN:
24 Q    Just keep -- you can speak more slowly and keep your voice
25 up so we can all hear you.

Tkachuk - direct by Rubenstein

1      THE COURT:  Yes, that will help us.  Thank you.

2      THE WITNESS:  I indicated -- I looked in my partner's

3   direction.  I indicated that the individual that I escorted

4   outside of the vehicle he was safe and secure in the rear of

5   the vehicle.

6   BY MR. RUBENSTEIN:

7   Q    And by indicating, you mean you looked at him and you

8   maybe nodded your head?

9   A    That's correct.

10  Q    Okay.  And your intention was to convey to your partner

11  that the driver had been secured with handcuffs.  And now what

12  was your understanding of what your partner was going to do?

13  A    Well, at that point my understanding is that he's going to

14  proceed to take out the, the defendant and the front passenger

15  of the vehicle.

16  Q    And what was your planned next investigatory step once the

17  defendant had been taken out of the vehicle?

18  A    Once the occupants of the vehicle were taken out of the

19  vehicle, we would have searched the vehicle for more open

20  alcohol or possible contraband in the vehicle.

21  Q    And again, it's your understanding that based on the

22  existence of the open alcohol, you were justified in searching

23  the vehicle for additional contraband?

24  A    That's correct.

25  Q    What happened after you indicated to your partner that it

Tkachuk - direct by Rubenstein

1   was now safe for him to have the defendant exit the vehicle?

2   A    My partner requested the defendant to step out of the

3   vehicle.

4   Q    Did the defendant comply with that request?

5   A    He did not.

6   Q    What happened?

7   A    I heard my partner request once more I believe, and then

8   with negative results.

9   Q    And what, if anything, did your partner then do?

10  A    He opened the door to assist the defendant to step out of

11  the vehicle.

12  Q    And at that point did the defendant get out?

13  A    No.

14  Q    Okay.  What happened at that point?

15  A    At that point I went to the driver's side of the vehicle

16  in an attempt to assist my partner at that point.  Once I got

17  to the driver's side, the defendant proceeded to step out.

18  Q    But before the defendant stepped out, did you hear -- and

19  we'll hear it on video, but it's kind of fast and hard to

20  hear -- did you hear your partner say words to the effect of

21  why the F not?

22  A    That's correct.

23  Q    And that's before the, the defendant got out, correct?

24  A    That's correct.

25  Q    And did you say anything at that point?

Tkachuk - direct by Rubenstein

1    A    I believe when I went to the right side of the vehicle, I
2    did proceed to ask him how many times does my partner have to
3    ask you to step out of the vehicle.
4    Q    And then what happened once the defendant did actually
5    comply with that command?
6    A    He, he stepped out of the vehicle.
7    Q    And did your partner then attempt to handcuff the
8    defendant?
9    A    He did.
10   Q    And was he able to?
11   A    No.
12   Q    What happened?
13   A    At that point the defendant ran.  Pushed out the vehicle
14   and he ran westbound, changed direction, and then fled on --
15   attempted to flee on foot southeast towards the Grand Crossing
16   Park.
17   Q    And did you and your partner pursue him?
18   A    We did.
19   Q    Were you able to catch up to him and attempt a takedown?
20   A    We did.
21   Q    And were you successful at first?
22   A    We were successful at taking the defendant down, but we
23   weren't successful to apprehend him.
24   Q    Did he continue to resist even after you got him on the
25   ground?

Tkachuk - direct by Rubenstein

1    A    He did.

2    Q    In what way?

3    A    He stiffened his arms.  He pulled away.  And we were not

4    successful at handcuffing him.

5    Q    Did you make any threats to him in order to get him to

6    comply with your efforts to secure him?

7    A    I did.  I did warn him that if he does not comply I will

8    tase him.

9    Q    After that, did he comply and were you able to handcuff

10   him?

11   A    After that warning, he did comply, and I was successful at

12   handcuffing him.

13   Q    Okay.  And he was on the ground.  Was he facedown on the

14   ground as you handcuffed him behind -- with his hands behind

15   his back?

16   A    Correct.  He was on his -- he's facedown -- well, his

17   head -- well, his chest down.  His legs were parallel to the

18   ground with his handcuffs behind his back.

19   Q    And then did he remain on the ground facedown for some

20   period of time at that point?

21   A    He did.

22   Q    And what were you waiting for at that time?

23   A    We did request additional units to, to arrive.  As I

24   mentioned prior, it was the most northeast part of the

25   district.  And it took -- for assisting units it took

Tkachuk - direct by Rubenstein

1    several -- probably a half a minute for somebody to respond.
2    So I was waiting for somebody to respond to obviously aid us in
3    our traffic stop.
4    Q    And once backup did arrive, did you then have an
5    opportunity to pat down the defendant?
6    A    Correct.  Once backup arrived, they assisted me in getting
7    up the defendant.  And at that point we did conduct a custodial
8    pat down of the defendant.
9    Q    And did you find anything as a result of your search?
10   A    I did --
11              THE COURT:  Before we get to that, excuse me.  How
12   much backup arrived?  How many cars?
13              THE WITNESS:  If I could recall correctly, it was one
14   vehicle and then another one arrived shortly after.  So I think
15   we had a total of two assisting vehicles.
16              THE COURT:  Proceed.
17              MR. RUBENSTEIN:  Thank you, Judge.
18   BY MR. RUBENSTEIN:
19   Q    Did you discover anything upon your pat down of the
20   defendant?
21   A    I did.
22   Q    And what was that?
23   A    His right pocket I discovered a weapon.
24   Q    And is that his right front pant pocket?
25   A    Correct.

Tkachuk - direct by Rubenstein

1  Q    And what, what kind of weapon was it?

2  A    It was a blue steel black handle semiautomatic handgun

3  with one live round chambered and a unknown amount of rounds in

4  the magazine.

5  Q    And what did you then do with that gun?

6  A    I took the handgun out, out the pocket and made the weapon

7  safe and clear.

8         MR. RUBENSTEIN:  And, Your Honor, I think there's no

9  objection to Government Exhibit 1, which is the body worn

10 camera video from Officer Tkachuk's video.

11        THE COURT:  Is that correct, Mr. Clavelli?

12        MR. CLAVELLI:  Yes, Judge.

13        THE WITNESS:  That's correct.

14        MR. RUBENSTEIN:  And move that into evidence, Judge.

15        MR. CLAVELLI:  No objection.

16        THE COURT:  All right.  It's in evidence.

17     (Whereupon, Government Exhibit 1 was received in evidence.)

18        MR. RUBENSTEIN:  I need technical assistance from my

19 colleague here.

20     (Brief pause.)

21 BY MR. RUBENSTEIN:

22 Q    All right.  I'm going to play the video and just going to

23 stop it towards the beginning just to have you confirm where it

24 is that you first indicate --

25        MR. RUBENSTEIN:  Did want me to proceed, Judge?  I'm

Tkachuk - direct by Rubenstein

1  sorry.

2              THE COURT:  Yes.  Yes.  Proceed.

3              MR. RUBENSTEIN:  Thank you.

4  BY MR. RUBENSTEIN:

5  Q    I'm going to start the video and just stop it at the point

6  at which you first observe the alcohol container and make your

7  indication to your partner, okay.

8  A    I'm sorry.  You want me to stop it or --

9  Q    No, I'll stop it here.

10  A    Okay.

11      (Whereupon, said videotape was played in open court.)

12  BY MR. RUBENSTEIN:

13  Q    Was that the indication that you testified about?

14              THE COURT:  Which indication?  A little more

15  specific, Counsel.

16              MR. RUBENSTEIN:  Yes.  I'm sorry, Judge.

17  BY MR. RUBENSTEIN:

18  Q    Where you raised your hand and made the alcohol -- the

19  gesture about a bottle and then pointing towards the car, what

20  were you doing there?

21  A    I indicated to my partner that there's alcohol present in

22  the vehicle.

23  Q    Okay.  So you saw the bottle pretty quickly upon

24  approaching the vehicle?

25  A    That's correct.

Tkachuk - direct by Rubenstein

1    Q    All right.  I'm going to continue to play it now.

2         (Whereupon, said videotape was played in open court.)

3    BY MR. RUBENSTEIN:

4    Q    You made the signal again there?

5    A    That's correct, yeah.

6    Q    And could you hear yourself say who's drinking that

7    bottle?

8    A    Yes.

9    Q    Okay.  And could you hear the defendant say me, or words

10   to that effect?

11   A    That's correct.

12        THE COURT:  Counsel, the Court would prefer you

13   either ask him what was said instead of you saying can you hear

14   yourself say.

15        MR. RUBENSTEIN:  I will, Judge.

16        THE COURT:  I think that would be much more --

17        MR. RUBENSTEIN:  I think he already testified on --

18        THE COURT:  He did.  He did.  So either -- you can

19   either let me just listen, or if you think it needs clarifica-

20   tion, ask him.  But for you to ask --

21        MR. RUBENSTEIN:  I will, Judge.  In fact, I'll just

22   back it up a few seconds and just let it play from here on out.

23        THE COURT:  All right.  That's fine.  Thank you.

24        MR. RUBENSTEIN:  Thank you, Judge.

25        (Whereupon, said videotape was played in open court.)

Tkachuk - cross by Clavelli

1   BY MR. RUBENSTEIN:

2   Q    Is that the firearm you have testified about?

3   A    That's correct.

4   Q    And what did you mean by on person?

5   A    I let my partner know that on person means there's a

6   weapon on, on the defendant.  Because I saw him looking

7   underneath the seat searching the vehicle.  And I just let him

8   know that the defendant did have a weapon on him.

9   Q    And based on the video and your recollection, about how

10  much time passed from the traffic stop until the defendant

11  fled?

12  A    About two minutes.

13        MR. RUBENSTEIN:  That's all I have, Judge.

14        THE COURT:  All right.  Thank you.

15  Cross-examination, Mr. Clavelli.

16        MR. CLAVELLI:  Thank you, Judge.

17                    CROSS-EXAMINATION

18  BY MR. CLAVELLI:

19  Q    Officer, what did you say your assignment was that night?

20  A    The 6th District.  6th -- I don't recall exactly 41 or 42

21  robbery, but either one of those cars.  It's a rapid response

22  car used to ascertain special missions that were given down by

23  the commander.

24  Q    I mean, are you supposed to drive continuously through a

25  particular area of the city?

Tkachuk - cross by Clavelli

1   A    Yes.

2   Q    And you're a rapid response car?

3   A    Yes.

4   Q    Isn't that what you said?

5   A    That's correct.

6   Q    You weren't doing traffic, correct?  You weren't on

7   traffic duty?

8   A    Not specifically.

9   Q    And were you the only car in, in that particular area?

10  A    I don't recall actually.

11  Q    Well, you were on a particular shift, weren't you?

12  A    Correct.

13  Q    And you weren't the only police officers, you and your

14  partner on that shift, right?

15  A    That's correct.

16  Q    So when you decided to pull over the white vehicle because

17  it had a -- its brights on, you knew what time of the morning

18  it was, correct?

19  A    That's correct.

20  Q    And you could have called for backup, couldn't you?

21  A    I guess.

22  Q    Well, did you feel that you were in some sort of danger at

23  that point in time when you pulled behind the white car?

24  A    I did not.

25  Q    If you felt you were in some sort of danger, you would

Tkachuk - cross by Clavelli

1   have called for backup, right?

2   A    Well, if there's -- if there's a need and opportunity for

3   backup, we do call for backup, yes.  But at that time just

4   conducting a traffic stop does not necessarily mean I need

5   assistance.

6   Q    Well, have you conducted traffic stops in the past?

7   A    I have.

8   Q    And have you ever used a computer to run the driver's

9   license?

10  A    I have.

11  Q    Did you do it that night?

12  A    I did.  But the driver did not produce a license.

13  Q    Did you end up giving the driver a ticket for no license?

14  A    I did not.

15  Q    He left without being ticketed, correct?

16  A    He did, yes.

17  Q    And he left after you went on the computer and saw that he

18  had a valid license, isn't that right?

19  A    Once I verified that he was -- had a valid license and

20  he's able to operate a vehicle, yes.

21  Q    And that was because you had his name because he had a lot

22  of identification with him, including his insurance card, isn't

23  that right?

24  A    I don't recall seeing his insurance card.

25  Q    Let me ask you, how many times have you viewed this video?

Tkachuk - cross by Clavelli

1   A    Multiple.

2   Q    More than 10?

3   A    I wouldn't say more than 10.

4   Q    More than five?

5   A    About.

6   Q    About five?

7   A    About five.

8   Q    Can you actually hear what you're saying when you approach

9   that car?

10  A    Yes.

11  Q    And did you hear yourself say roll down the windows,

12  because I didn't?

13  A    I heard myself.

14  Q    Pardon me?

15  A    I believe I heard myself.

16  Q    Well, the windows were open when you, when you approached

17  the car, weren't they?

18  A    I don't recall them being open.

19  Q    Well, I would say within five seconds of that video

20  starting, the windows are open --

21          THE COURT:  Are you testifying?

22          MR. CLAVELLI:  I beg your pardon.  You know, Judge,

23  I'm not going to sit here and play this thing.

24          THE COURT:  Okay.

25          MR. CLAVELLI:  Because I'm just not technically.  But

Tkachuk - cross by Clavelli

1    I will be arguing that you look at that video, and you won't

2    see what they claim.

3    BY MR. CLAVELLI:

4    Q    Did you feel safe while the three people were in the

5    vehicle, or did you feel that you and your partner were in some

6    kind of danger?

7    A    We felt safe at that time.

8    Q    Then why did you ask the driver to get out of the vehicle?

9    A    Because he did not have -- he failed to produce a license.

10   There's alcohol presence in the vehicle.  I did not know who he

11   was, if he had a valid license.  Therefore, he was requested to

12   step out of the vehicle.

13   Q    The man had a handful of documents.  He had them.  He

14   pulled them out of his jacket, and he pulled them out of the

15   glove box.  You saw that, correct?

16   A    Correct.

17   Q    You're telling me that you didn't know his name, but you

18   did let him go because you learned his name at some point?

19   A    Once I verified he had a valid license, yes, he was.

20   Q    So you knew his name, correct?

21   A    I obtained his name, yes.

22   Q    Why didn't you run his name before you asked him to get

23   out of the car while you were still feeling safe?

24   A    We asked him to get out of the car because as I mentioned,

25   I did not know if he -- if he was able to drive the vehicle, if

Tkachuk - cross by Clavelli

1  his driving privileges were suspended, or if he had a warrant,

2  or so I was not -- I didn't know if his name was clear, put it

3  that way.

4  Q    Are you testifying that when he got out of the car, you no

5  longer felt safe?

6  A    We still felt, felt safe.

7  Q    So you handcuffed the driver even though you felt safe at

8  that time?

9  A    The handcuffing is a precautionary procedure that we do.

10 Q    Not because he represented a danger to you, is that right?

11 A    That's correct.

12 Q    Are you familiar with the Special Order 4-13-09 that is

13 entitled Investigatory Stop System?

14 A    I'm familiar with it.

15 Q    You're familiar with it, aren't you?

16 A    Correct.

17 Q    Well, I have a copy of it in my hand.  You're aware that

18 at page 2 it defines investigatory stop.  I can show you.  I'm

19 not going to ask you to read it, but page 2 of the order,

20 investigatory stop at the top.

21 A    I'm aware.  I'm aware it says that.

22         MR. RUBENSTEIN:  Judge, I'd just object to the

23 relevance for purposes of the suppression hearing.

24         THE COURT:  All right.  One second.  I'm going to

25 allow it.  First of all, you know what he's talking about.

Tkachuk - cross by Clavelli

1    You've seen the document, correct?

2            MR. RUBENSTEIN:  I have.  And it's attached to their

3    brief, Judge.

4            THE COURT:  All right.  I just wanted to make sure

5    that we pass that step.  Now, you're handing this to -- is this

6    an exhibit for you?

7            MR. CLAVELLI:  I don't think it's going to be

8    necessary, but I'm --

9            THE COURT:  All right.

10   BY MR. CLAVELLI:

11   Q    Right below that it defines protective pat down?  You see

12   that?

13   A    Correct.

14   Q    And below that it says reasonable articulable suspicion.

15   You see that?

16   A    Correct.

17   Q    And you're supposed to be aware of that, correct?

18   A    That's correct.

19   Q    Is there anywhere in this order that says, to the best of

20   your knowledge, that you can handcuff somebody when you don't

21   feel that you are in danger for your personal safety?

22           MR. RUBENSTEIN:  I object to the relevance and the

23   foundation, Judge.

24           THE COURT:  As to?

25           MR. RUBENSTEIN:  As to the use of this order and the

Tkachuk - cross by Clavelli

1    questions that, that Mr. Clavelli is asking.  I don't think

2    it's relevant to the suppression hearing whether there's an

3    investigatory stop order that requires certain documentation.

4    I mean, what they asked for and then what they argued in their

5    motion is this required some sort of postarrest documentation.

6    That's, that's the purpose of the document as far as I'm aware.

7              THE COURT:  I'll allow it.  Since he can make --

8    actually can make the argument without the reference to the

9    investigatory stop rule, he could make this same argument, the

10   Court is just going to allow it for what it is, and the Court

11   will consider it.  Proceed.

12   BY MR. CLAVELLI:

13   Q    The point, Officer, is you received certain training,

14   isn't that right?

15   A    Correct.

16   Q    Now, in July of '17 when this stop took place, how long

17   were you on the force?

18             MR. RUBENSTEIN:  I think --

19             THE WITNESS:  2019.

20             MR. RUBENSTEIN:  -- 2019.

21             MR. CLAVELLI:  Oh.  2019, right.

22   BY MR. CLAVELLI:

23   Q    How long?

24   A    Roughly three years I would say.

25   Q    Roughly three years?

Tkachuk - cross by Clavelli

1    A    That's correct.

2    Q    Did you feel that the driver of the vehicle was committing

3    a crime?

4              MR. RUBENSTEIN:  I object to the --

5              THE COURT:  Form of the question sustained.

6    BY MR. CLAVELLI:

7    Q    Did you view anything that indicated to you that the

8    driver had been committing a crime?

9    A    The probable cause for the stop and then the further

10   investigation of the alcohol in the vehicle.  So the presence

11   and the fact that he was the one driving, transporting the

12   alcohol, he could have been placed in custody for the open

13   alcohol because that is -- he's the one operating the vehicle.

14   Q    So you believe -- now, now, you wrote on -- you wrote a

15   report, correct?  Correct?

16   A    My partner and I narrated it, yes.

17   Q    All right.  And you indicate in the report that the

18   traveling on 76th with high beams, 9-40-090, and that's the

19   violation for driving with high beams; right?

20   A    Yes.

21   Q    And that's a municipal code violation, isn't it?

22   A    It is.

23   Q    So you cannot arrest somebody for a municipal code

24   violation, you're aware of that, correct?

25             MR. RUBENSTEIN:  Object to the form, Judge.

Tkachuk - cross by Clavelli

1    THE COURT:  Objection sustained.  Ask a different

2  question.

3  BY MR. CLAVELLI:

4  Q    So is it your testimony you arrested the driver, put him

5  in handcuffs because he was driving with his brights on?

6    MR. RUBENSTEIN:  Judge, it misstates the evidence in

7  term of having arrested the driver.

8    THE COURT:  The Court has heard the evidence.  This

9  is cross.  The Court will decide what the facts are.  Proceed.

10  Can you answer that question, sir?

11    THE WITNESS:  Can you please repeat the question.

12    THE COURT:  Can you repeat it, Miss McCullough.

13  BY MR. CLAVELLI:

14  Q    Did you put the -- did you ask the driver to get out and

15  put the handcuffs on him because he was driving with his

16  brights on?

17  A    I did not put the handcuffs on the driver just because he

18  was driving with his brights on.

19  Q    Was it because he couldn't produce a driver's license?

20  A    Correct.  One of the reasons.

21  Q    And you didn't give him a citation for that, did you?

22  A    I did not.

23  Q    And yet is it your testimony that the handcuffs were

24  related to the failure to have a driver's license?

25  A    Correct.

Tkachuk - cross by Clavelli

1  Q    And what, what was so important that you took him out of

2  the vehicle while you verified if he had a driver's license?

3  What was the reason for that?

4  A    Well, we can ask anybody out of the vehicle, but

5  especially when a driver does not have a license and fails to

6  produce a license.  Further investigate.  We have a lot of

7  vehicles that take off on officers, especially if there's any

8  contraband or driving, driving privileges are revoked.  So to

9  secure the driver and the vehicle, that is one of the

10 procedures that we do.  And that's how we conduct our traffic

11 stops.

12 Q    Have you ever seen that procedure in a written order, that

13 you just described?

14 A    I haven't.

15 Q    Who taught you that procedure?

16        MR. RUBENSTEIN:  Objection, Judge.

17        THE COURT:  Objection's overruled.

18        THE WITNESS:  It's just the way we, we conduct our

19 traffic stops.

20 BY MR. CLAVELLI:

21 Q    So you feel you have the prerogative to ask any driver at

22 any time you are -- they're pulled over for traffic to get out

23 of the car and you're going to handcuff them, is that right?

24 A    Every situation is different, sir.

25 Q    I beg your pardon?

Tkachuk - cross by Clavelli

1   A    Every situation is different.

2   Q    And what was specific about this situation that caused you

3   to handcuff the driver?

4   A    Because he failed -- initially he failed to produce a

5   license.

6   Q    Did you hear yourself say on that tape you're not under

7   arrest?

8   A    Correct.

9   Q    You say you did?

10  A    Yes.

11  Q    Well, you're the only one.

12          MR. RUBENSTEIN:  Judge --

13          THE COURT:  Objection sustained.  Strike the

14  commentary.  Mr. Clavelli, you know better.

15          MR. CLAVELLI:  Okay.

16          THE COURT:  Come on.

17  BY MR. CLAVELLI:

18  Q    Did you tell the driver you were going to look in the

19  trunk?

20  A    I did not tell him that.

21  Q    You used the word contraband?

22          MR. RUBENSTEIN:  Judge, at what point of the incident

23  are we asking?

24          THE COURT:  Be a little more clear, Mr. Clavelli.  At

25  any -- you could just say at any time.

Tkachuk - cross by Clavelli

BY MR. CLAVELLI:

Q    At any point during the time you are near the driver, did you tell him you were going to look for contraband?

A    Honestly I don't, I don't remember.

Q    Do you know when you're allowed to drive with your bright lights on?

A    If you're driving with your bright lights on and you see an oncoming vehicle, you're supposed to dim your bright lights 350 feet prior to the other vehicle approaching.

Q    Was it late at night?

A    It was 2:30 in the morning, yes, sir.

Q    Was the street dark?

A    That area of the street, it is dark, yes.

Q    I mean, they were on the side along the park, weren't they?  Grand Crossing Park.

A    When I observed -- when we observed the vehicle, it was west of Cottage Grove.

Q    I beg your pardon?

A    When we observed the vehicle initially, it was still traveling eastbound before Cottage Grove, so that area was still well lit.

Q    You would agree that traffic was extremely light at that time of night?

A    I'm sorry?

Q    You would agree that traffic was very light at that time

Tkachuk - cross by Clavelli

1  of night?

2  A    If I could recall correctly, there were several vehicles

3  behind the, the white vehicle that we pulled over.  So there

4  was, there was vehicles on the road.  There was some traffic.

5         THE COURT:  Excuse me.  Can I ask, what kind of

6  vehicle was this?

7         THE WITNESS:  The vehicle that we pulled over?

8         THE COURT:  Yes.

9         THE WITNESS:  It was a white Mercedes.

10        THE COURT:  Mercedes.  Go ahead.

11 BY MR. CLAVELLI:

12 Q    When you asked the driver to get out of the vehicle and as

13 you were cuffing him, had you had a conversation with your

14 partner about taking all three passengers out of the vehicle

15 already?

16 A    We did not have that conversation.

17 Q    Did you at some point tell him to remove the other

18 passengers from the vehicle?

19 A    Not verbally, no.

20 Q    Did you give him some kind of a sign to remove the other

21 passengers out of the vehicle?

22 A    No.

23 Q    Your concern for the driver was that he might pull away,

24 isn't that what you said?

25 A    That is one of the concerns, yes.

Tkachuk - cross by Clavelli

1   Q    And you didn't want to be chasing after him or call other

2   police officers to join the chase, is that right?

3   A    When you say it like that, yes.

4   Q    And after you cuffed the driver, did you feel that a crime

5   was being committed?

6             MR. RUBENSTEIN:  I object to the form.

7             THE COURT:  Objection sustained.  Form of the

8   question, Counsel.  Let's stay away from his feelings.

9   BY MR. CLAVELLI:

10  Q    Did you see a crime in progress when you had the driver

11  out of the vehicle while the other two were sitting in the

12  vehicle?

13            MR. RUBENSTEIN:  Judge, I object to the in progress

14  part.  Had he seen a crime that he was --

15            THE COURT:  The form of the question sustained.

16  BY MR. CLAVELLI:

17  Q    Did you see the driver committing a crime while he was

18  sitting in the vehicle?

19  A    Well, if you consider open alcohol in the vehicle as a

20  crime, yes, we did.

21  Q    Do you consider it a crime?

22  A    If you consider it a crime, having open alcohol in the

23  vehicle.

24  Q    Oh, I understand.  Okay.  Thank you.  I understand.  If I

25  consider it a crime.

Tkachuk - cross by Clavelli

1      Well, did the driver put you in fear for your safety
2  by doing any particular thing?
3          MR. RUBENSTEIN:  Asked and answered, Judge.
4          THE COURT:  I'll allow it.  Go ahead.
5  BY MR. CLAVELLI:
6  Q    Did the back seat --
7          THE COURT:  Wait.  Wait.  Wait.  Wait.  Wait.  Mr.
8  Clavelli --
9          MR. CLAVELLI:  You're shaking your head, but --
10          THE COURT:  But let's at least figure out.  Sir, you
11  either have to answer verbally, or if you can't answer a
12  question, ask him to --
13          THE WITNESS:  I was --
14          THE COURT:  -- rephrase it.
15          THE WITNESS:  Okay.  I was attempting to.  I was -- I
16  did not feel I was in fear for my safety at that point.  It's
17  just a precautionary thing that we do so that we would not get
18  to that point where we feel unsafe.
19  BY MR. CLAVELLI:
20  Q    Did you think prior -- strike that.
21          Did you see anything prior to the other two
22  passengers getting out of the vehicle which led you to believe
23  that they posed a danger to you or your partner?
24  A    At that time, no.
25  Q    You didn't cuff them while they were sitting in the

Tkachuk - cross by Clavelli

1   vehicle, correct?

2   A     That's correct.

3   Q     They couldn't drive the vehicle away.  They weren't

4   sitting in the driver's position, isn't that right?

5   A     That's right.

6   Q     So why did you ask the passengers to get out of the car?

7   Was it strictly procedure?

8   A     There's open alcohol in the vehicle, so we were going to

9   search the vehicle for more open alcohol or contraband in that

10  vehicle.

11  Q     You told the driver you were going to search it for

12  contraband, didn't you?

13  A     I didn't -- I don't recall telling him that.

14  Q     So even though you did not feel you were in -- strike

15  that.

16          So you admit performing a pat down on the driver,

17  right?

18  A     Just a protective pat down, yes.

19  Q     And you perform a pat down, you or your partner on the

20  rear seat passenger?

21  A     I did not.

22  Q     You cuffed her, though?

23  A     I did not cuff her.

24  Q     Pardon me?

25  A     I did not.

Tkachuk - redirect by Rubenstein

1   Q    Somebody cuffed her, correct?

2   A    I don't recall actually.

3   Q    All right.  Well, for the record at the end of the tape

4   it's pretty obvious.

5          MR. CLAVELLI:  By the way, Your Honor, I'm going to

6   be calling her as a witness.

7          THE COURT:  Okay.  We'll deal with it then.  Anything

8   else of this witness?

9          MR. CLAVELLI:  Not much, Judge.  I may be done.

10  BY MR. CLAVELLI:

11  Q    Is there anything that you haven't told us that you

12  believed at that night that any of these three people posed a

13  danger to you or your partner?

14  A    No.

15         MR. CLAVELLI:  I have no further questions.

16         THE COURT:  All right.  Thank you.  Any redirect

17  government?

18         MR. RUBENSTEIN:  Yes, just very briefly, Judge.

19         THE COURT:  All right.

20                REDIRECT EXAMINATION

21  BY MR. RUBENSTEIN:

22  Q    Officer Tkachuk, Mr. Clavelli asked you a number of

23  questions about whether you felt a danger when the driver was

24  out of the vehicle but the other two passengers were in the

25  vehicle.

Tkachuk - redirect by Rubenstein

1    Would you have felt any danger to yourself or your
2  partner if all three of them had been outside of the vehicle
3  without having them detained with handcuffs?
4  A    Correct.  That would be -- obviously pose a greater
5  danger, yes.
6  Q    Okay.  And does that play a part in the decision to place
7  those individuals in handcuffs at that time?
8  A    It does.
9  Q    And the reason that you asked the driver and were going to
10  ask the other passengers out of the vehicle was to conduct a
11  search of that vehicle, correct?
12  A    Correct.
13  Q    So having -- even if you had verified the driver's
14  identity on your computer, that would not have ended the
15  investigation, would it?
16  A    It would not have.
17  Q    You had further investigative steps, including the search
18  of the vehicle, correct?
19  A    Correct.
20  Q    And you had further steps, including determining what to
21  do about the open alcohol violation, correct?
22  A    Correct.
23  Q    And open alcohol in a car is, in fact, a criminal offense,
24  which subjects the driver and the possessor to arrest; correct?
25            MR. CLAVELLI:  Objection.  Objection.

Tkachuk - redirect by Rubenstein

1          THE COURT:  Basis?

2          MR. CLAVELLI:  It's a conclusion of law, and it's not

3   even a correct conclusion of law.

4          THE COURT:  Excuse me one second.  The question was

5   is a criminal offense which subjects the driver to an arrest.

6          MR. RUBENSTEIN:  Yes, Judge.

7          THE COURT:  The way you have phrased that for this

8   particular nonlegal witness, the Court grants the -- sustains

9   the objection.

10          MR. RUBENSTEIN:  Yes, Judge.

11          THE COURT:  All right.

12  BY MR. RUBENSTEIN:

13  Q    Officer Tkachuk, you were asked about whether the driver

14  was actually given any citations after the incident, correct?

15  A    Correct.

16  Q    Okay.  Did the driver cooperate in the traffic stop to the

17  best of his ability as far as you were concerned?

18  A    He did.

19  Q    Okay.  Do you have the discretion to not give a citation

20  under those circumstances?

21  A    I do.

22  Q    In addition, after the defendant fled leading to the

23  pursuit and the arrest and everything that happened with

24  respect to the defendant's flight, is it fair to say you had

25  been sidetracked in your original purpose of the stop?

Tkachuk - redirect by Rubenstein

1          MR. CLAVELLI:  Objection.

2          THE COURT:  Objection sustained.  The form of the

3     question.

4     BY MR. RUBENSTEIN:

5     Q    Is it fair to say that at that point issuing citations to

6     the driver was no longer your highest priority?

7     A    That's correct.

8     Q    With respect to the policy, this investigatory stop policy

9     that you were asked about, are you -- did you, in fact, produce

10    any documentation regarding probable cause for the detention

11    that you executed that evening?

12    A    That's correct.

13    Q    And what kind of documentation is that?

14    A    It's called a TSSS card.  It's done and performed and

15    written only when you don't issue citations.  So basically you

16    document the basis of the stop, including your probable cause

17    for the stop.

18    Q    And does your police report reference the fact that a TSSS

19    card was completed and filed?

20    A    It does.

21    Q    And are you aware that the investigatory stop policy which

22    counsel showed to you specifically says that it only applies if

23    no other documentation reflecting probable cause had been

24    created?

25    A    That's correct, I'm aware.

Tkachuk - recross by Clavelli

1    MR. RUBENSTEIN:  That's all, Judge.

2    THE COURT:  Recross.

3    MR. CLAVELLI:  I'd like, I'd like to see that card

4    that he claims he filled out.

5    THE COURT:  We can talk about that, Mr. Clavelli.

6    MR. CLAVELLI:  I can't cross on --

7    THE COURT:  But Mr. -- you've never seen it?

8    MR. CLAVELLI:  No.

9    THE COURT:  All right.

10   MR. CLAVELLI:  It's never been produced.

11   THE COURT:  Well, he just asked him if I did one.  So

12   if you want to at least show him -- it never was produced?

13   MR. RUBENSTEIN:  It's referenced in the police

14   report.

15   THE COURT:  Do you have it?

16   MR. RUBENSTEIN:  I do not.

17   THE COURT:  All right.  He doesn't have it, Mr.

18   Clavelli.  He references it in the report, which you do have,

19   correct?

20   MR. CLAVELLI:  Correct.

21   THE COURT:  Any questions on what was brought up in

22   redirect?

23                    RECROSS-EXAMINATION

24   BY MR. CLAVELLI:

25   Q    Do you understand that placing handcuffs on somebody is an

Tkachuk - recross by Clavelli

1   act that is consistent with their arrest?

2   A    I understand that it's consistent with an arrest, yes.

3   Q    Do you frequently put handcuffs on people and tell them

4   I'm handcuffing you, but I'm not putting you under arrest?

5   A    If we detain an individual, we do place handcuffs on them.

6           THE COURT:  That wasn't the question.

7           THE WITNESS:  I'm sorry.  Well, can you repeat the

8   question.

9   BY MR. CLAVELLI:

10  Q    Well, I'll just --

11          THE COURT:  No.  No.  No.  No.  I want it repeated

12  verbatim.  Miss McCullough.

          (Record read.)

13

14          THE WITNESS:  No.

15  BY MR. CLAVELLI:

16  Q    You know that when you handcuff somebody, their freedom is

17  curtailed, correct?  You have detained them, correct?

18  A    Correct.  Detention.

19  Q    And you decided you were going to take these three people

20  and detain them so you could make a search of the vehicle,

21  isn't that right?

22  A    Correct.  Momentarily detain them.

23  Q    But you were going to do that without calling for backup,

24  is that right?

25  A    We did call for backup, but every situation is different.

Tkachuk - recross by Clavelli

1   I can't --

2   Q    When did you call for backup?

3   A    I believe once the defendant's actions transpired.

4   Q    When the defendant ran?

5   A    Correct.

6   Q    Who called for backup?

7   A    I don't, I don't know if it was myself or my partner.

8   Either or.

9   Q    The police were there while he was still on the ground,

10  weren't they, the other police?

11          THE COURT:  The backup.

12  BY MR. CLAVELLI:

13  Q    The cars were there while he was still on the ground?

14  A    They might have just arrived.  I --

15  Q    So it's fair to say that backup arrived in like three

16  minutes or less?

17  A    Actually it took longer than expected.  Our district is

18  pretty small, and there's ample amount of cars all over.  Like

19  I mentioned prior, that portion of the district is the north --

20  the most northeast corner of the district.  For the amount of

21  time it took for the vehicles to arrive, it actually -- longer

22  than expected.

23  Q    So you decided I'll just handcuff these citizens, and

24  we'll, we'll veri --

25          THE COURT:  Mr. Clavelli.

                          Gomez - direct by Berry

1    BY MR. CLAVELLI:

2    Q    -- we'll see if they've committed any other crimes, is

3    that right?

4              THE COURT:  Sustained.

5              MR. RUBENSTEIN:  Judge, I object to the argument.

6              THE COURT:  Sustained.  Leave it for argument, Mr.

7    Clavelli.

8              MR. CLAVELLI:  No further questions.

9              THE COURT:  All right.  You may step down, sir.

10   Thank you.

11             THE WITNESS:  Thank you.

12        (Witness excused.)

13             MR. BERRY:  We're going to call Officer Gomez, Your

14   Honor.

15      KEVIN GOMEZ, GOVERNMENT'S WITNESS, DULY SWORN

16             THE COURT:  Proceed whenever you're ready.

17             MR. BERRY:  Thank you, Your Honor.

18                      DIRECT EXAMINATION

19   BY MR. BERRY:

20   Q    Could you please state your name for the record and spell

21   your last name for the court reporter.

22   A    Yes.  It's Officer Gomez.  G-O-M-E-Z.

23   Q    Officer Gomez, where do you work?

24   A    6th District.

25   Q    And is that with the Chicago Police Department?

Gomez - direct by Berry

1    A    Yes.

2    Q    What's your title there with the Chicago Police

3    Department?

4    A    Chicago Police officer.

5    Q    How long have you been a Chicago Police officer with the

6    CPD?

7    A    Three and a half years.

8    Q    And are you currently assigned to a specific area?

9    A    Yes.

10   Q    And where is that?

11   A    Auburn Gresham and Grand Crossing.

12   Q    And is that in the 6th District?

13   A    Correct.

14   Q    How long have you been assigned -- as you sit here today,

15   how long have you been assigned to the 6th District?

16   A    Two years.

17   Q    Prior to being in the 6th District, were you assigned

18   somewhere else?

19   A    Yes.

20   Q    And where was that?

21   A    The 3rd District.

22   Q    How long were you there?

23   A    About a year.

24   Q    And prior to that, would that take you into the academy?

25   A    Yes.

Gomez - direct by Berry

1    Q    I want to talk to you a little bit about the 6th District.

2    Have you had the occasion to make arrests in that district --

3    A    Yes.

4    Q    -- prior to this?

5    A    Yes.

6    Q    What types of behavior or crime is that district known

7    for?

8    A    It's multiple shootings, homicides, violent crime.

9    Q    And I want to direct your attention -- let me move forward

10   to July 7th, 2019.  Were you working that day?

11   A    Yes.

12   Q    And what hours were you working?

13   A    I worked the midnight shift.  First watch.

14   Q    About what time does that start?

15   A    It starts around 21:00 hours, which would be 9:00 p.m.

16   Q    And about what time would your shift end?

17   A    Approximately six in the morning.

18   Q    Were you in uniform or plainclothes that day?

19   A    Full uniform.

20   Q    Were you on foot or in a car?

21   A    In a vehicle.

22   Q    And were you working with a partner?

23   A    Yes.

24   Q    And who was your partner?

25   A    Officer Tkachuk.

Gomez - direct by Berry

1   Q    Now, let me direct your attention to about 2:30 in the
2   morning.  Were you and your partner on 76th Street around 951
3   East 76th Street?
4   A    Yes.
5   Q    Who was driving?
6   A    My partner.
7   Q    And where were you seated?
8   A    Passenger seat.
9   Q    Now, 951 East 76th Street, is that within the borders of
10  the 6th District?
11  A    Yes.
12  Q    And about 2:30 that morning could you please tell the
13  Court, what, if anything, you remember happening at that time.
14  A    That we were on routine patrol during that tour.  We
15  observed a vehicle traveling eastbound as we were driving
16  westbound, and we, we observed a violation as the vehicle had
17  its high beams on.
18  Q    And when you saw that, what, if anything -- your partner
19  is driving, is that right?
20  A    Yes.
21  Q    What, if anything, did your partner do?
22  A    He did a U-turn and proceeded to follow the vehicle.
23  Q    Now, did there come a time when you -- you or your partner
24  activated the lights of your police vehicle?
25  A    Yes.

Gomez - direct by Berry

1  Q    And what was the purpose of activating those lights?

2  A    Conducting a traffic stop.

3  Q    Did the vehicle stop?

4  A    Yes.

5  Q    Do you recall what kind of vehicle it was?

6  A    It was a white Mercedes.

7  Q    And that vehicle did stop, is that right?

8  A    Yes.

9  Q    Now, when the vehicle stopped, what did you do?

10  A    I exited the marked squad car.

11  Q    And did you get out -- where did you get out?  Is that the

12  front passenger side?

13  A    Yes, front passenger side.

14  Q    Where did you go after you got out the vehicle?

15  A    I proceeded to the front passenger side of that vehicle.

16  Q    And when you got to the front passenger side of that white

17  vehicle, what did you do?

18  A    I illuminated the interior of the vehicle with my

19  flashlight.

20  Q    Were you equipped with body camera that day?

21  A    Yes.

22  Q    And are you -- from that day forward are you -- is CPD

23  currently equipped with body camera?

24  A    Yes.

25  Q    When you got to the car, did you in any way activate your

Gomez - direct by Berry

1    body camera?

2    A    Yes, I activated my camera prior to being parallel to the

3    vehicle.

4    Q    Now, after you activated your body camera, explain to the

5    Court what happened next.

6    A    My partner conducted a traffic stop.  He requested

7    documents from the driver of the vehicle.  He requested his

8    driver's license and insurance.  To which the driver was not

9    able to provide.

10   Q    Now, let's talk about the car a little bit.  When you

11   approached the car, were the windows up or down, if you recall?

12   A    They were up.

13   Q    And you're on the passenger -- by the front passenger side

14   of the vehicle, is that right?

15   A    Yes.

16   Q    At some point did those windows come down?

17   A    Yes.

18   Q    Do you know how it came that the windows went down?

19   A    My partner instructed the driver to lower the windows.

20   Q    And did the driver do so?

21   A    Yes.

22   Q    Now, those windows, were they clear?  Could you see

23   through the windows when they were up?

24   A    No.

25   Q    How would you describe those windows?

Gomez - direct by Berry

1   A    Those windows were dark.  They were tinted.

2   Q    And could you see inside the vehicle clearly when the

3   windows were up?

4   A    No.

5   Q    Now, you say you were standing by the front passenger side

6   of the vehicle, is that right?

7   A    Yes.

8   Q    When the windows were rolled down, was that front

9   passenger window rolled all the way down to the bottom?

10  A    Yes.

11  Q    And then could you see clearly into the vehicle?

12  A    Yes.

13  Q    After the windows were rolled down, explain to the Court

14  what happened next.

15  A    I observed the front passenger side.  My partner had

16  communicated to me and for me there was an open alcoholic

17  beverage inside the vehicle.

18  Q    And did he say that to you verbally?

19  A    No.

20  Q    What did he do?

21  A    He motioned to me.

22  Q    Okay.  And how long have you been working with Officer

23  Tkachuk?

24  A    Approximately two years.

25  Q    And at that point I guess we're about -- that was in July

Gomez - direct by Berry

1  of 2019, is that right?

2  A    Yes.

3  Q    And when you say you had been working with him for

4  approximately three years, that's as you sit here today?

5  A    Yes.

6  Q    So about two and a half years at that point, is that

7  right?

8  A    Yes.

9  Q    Now, after Officer Tkachuk motioned to you that there was

10  alcohol in the vehicle, what happened next?

11  A    I focused my attention to the front passenger side of that

12  vehicle.

13  Q    And was there a person sitting in that front passenger

14  side?

15  A    Yes.

16  Q    I don't think I asked you.  How many occupants were in

17  vehicle, if you remember?

18  A    Three occupants.

19  Q    And do you recall where they were seated?

20  A    Yes.

21  Q    Where were they seated?

22  A    The driver in the driver's seat.  The front passenger in

23  the front passenger seat, and the third occupant was a female.

24  She was sitting in the rear passenger side of the vehicle.

25  Q    Now, the person that was in the front passenger seat,

Gomez - direct by Berry

1  would you be able to recognize that person if you saw them
2  again?
3  A    Yes.
4           MR. BERRY:  Your Honor, it's my understanding that
5  counsel will stipulate that the person in the front passenger
6  seat was the defendant.
7           MR. CLAVELLI:  Yes, Judge.
8           THE COURT:  All right.  Thank you.
9           MR. BERRY:  Thank you, Your Honor.
10  BY MR. BERRY:
11  Q    Now, you say you were focused and you were watching the
12  defendant, is that right?
13  A    Yes.
14  Q    I think we're at the point where your partner motioned to
15  you that there was alcohol in the car.  Please continue and
16  tell the Court what happened after that.
17  A    He motioned to me.  We, we communicated not verbally but
18  with hand gesture.  At that point my attention became focused
19  on the front passenger seat.  I observed my -- the -- my
20  partner ask the driver out of the driver's seat, which he
21  complied after multiple verbal commands.
22  Q    Okay.  And what happened after the driver got out of the
23  vehicle?
24  A    I waited for my partner to give me the okay with the
25  driver.  And that at which point I asked the front passenger,

Gomez - direct by Berry

1  the front passenger out of the, out of the seat.

2  Q    And you say you waited for your partner to give you the

3  okay.  Can you just explain to the Court what you mean by that.

4  A    I was waiting for my partner to have the, the driver

5  safely secured to the rear of the vehicle.

6  Q    And why is that?

7  A    He was to be detained and handcuffed for our safety, as my

8  partner was conducting a protective pat down.

9  Q    Now, you said you asked the defendant to get out of the

10  vehicle, is that right?

11  A    Correct.

12  Q    Did the defendant comply?

13  A    No.

14  Q    What, if anything, did he do?

15  A    He actually raised the front passenger window up.

16  Q    And when that happened, what, if anything, did you do?

17  A    I had to open the front passenger side door.

18  Q    Why did you do that?

19  A    Because I would not be able to see in the vehicle.  The

20  defendant was nervous, breathing heavily, and refusing to make

21  eye contact or follow verbal commands.

22        MR. CLAVELLI:  I object to the characterizations.

23  Unless this guy's some kind of an expert.

24        THE COURT:  All right.  Overruled.  He can talk about

25  breathing heavily and some of the other ones, and you can

Gomez - direct by Berry

1    cross.  Overruled.  Proceed.
2               MR. BERRY:  Thank you, Your Honor.
3    BY MR. BERRY:
4    Q    So did you ask the passenger to get out of the vehicle?
5    A    Yes.
6    Q    How did you do that?
7    A    I verbally asked him to get out of the vehicle.
8    Q    Did you do anything else?
9    A    At which point?
10   Q    After you verbally asked him to get out of the vehicle,
11   did the passenger respond?  Let me ask you that.
12   A    No.
13   Q    And then what did you do?
14   A    I opened the front passenger door.
15   Q    And when you opened the front passenger door, what, if
16   anything, did you say to the defendant?
17   A    I said, why the fuck not.
18   Q    Okay.  Did you then draw your weapon?
19   A    Yes.
20   Q    And why did you do that?
21   A    For my own safety.
22   Q    Now, at that point did the passenger step out of the
23   vehicle?
24   A    Yes.
25   Q    When you stepped out of the vehicle, what, if anything,

Gomez - direct by Berry

1   did you do?

2   A    I holstered my weapon.  Took a step back, and then

3   attempted to approach the defendant to detain him.

4   Q    Now, you say you attempted to approach the defendant to

5   detain him.  What did the defendant do as you attempted to

6   approach him?

7   A    He fled.

8   Q    When you say he fled, he ran?

9   A    He ran.

10  Q    Were you able to get to the defendant before he ran?

11  A    No.

12  Q    Did you ever place hands on the defendant before he ran?

13  A    No.

14  Q    Did you ever grab the defendant's arm to place it behind

15  his back before he ran?

16  A    No.

17  Q    Did you pull out your handcuffs even before the defendant

18  ran?

19  A    No.

20  Q    Now, after the defendant ran, what did you do?

21  A    I ran after him.

22  Q    Did you immediately catch the defendant?

23  A    No.

24  Q    Explain to the Court the defendant's flight and your

25  chasing him.

Gomez - direct by Berry

1    A    He fled westbound from our direction, from our standing

2    point.  He ran towards my squad car.  At which point the

3    defendant turned back and ran towards the, the direction of

4    the -- where the vehicle was at initially.  I had to continue

5    to chase him towards that direction.

6    Q    Did you eventually catch up to the defendant?

7    A    Yes.

8    Q    And was he caught?

9    A    Yes.

10   Q    When he was caught, was he caught -- about how far away

11   from his -- from his car was he caught?

12   A    Several feet away.

13   Q    At that point what happened as the defendant was caught?

14   A    My partner had to conduct an emergency takedown.  I

15   conducted an emergency takedown.  And we were not successfully

16   able to place him in custody.  The defendant stiffened his

17   body, stretched his arms.  Then stiffened his arms, pulled his

18   arms towards his body, and did not -- and continued to not

19   listen to verbal commands.

20   Q    Were you eventually able to place handcuffs on the

21   defendant?

22   A    After, yes.

23   Q    After what was happening there on the ground?

24   A    After he, he -- he refused to be placed into custody.

25   Q    Did you eventually find out that a gun was recovered from

Gomez - direct by Berry

1    the defendant?

2    A    Yes.

3    Q    And did you see the recovery of that gun?

4    A    No.

5    Q    How did you find out that a gun was recovered from the

6    defendant?

7    A    My partner verbally told me.

8    Q    And what is it that he told you?

9    A    My partner said on person.

10   Q    And what did that mean to you?

11   A    He meant that he made a recovery from his body.

12   Q    Okay.  If I could -- when you first asked the defendant to

13   get out of the car, did he say anything to you after you asked

14   him to get out of the car?

15        Did he -- well, let me ask you this:  What did you

16   say to the defendant when you first asked him to get out of the

17   car?

18   A    I asked him to please step out the vehicle.

19   Q    And did he answer?

20   A    No.

21   Q    Is that what he said, or are you saying he didn't answer?

22   A    No.  He -- when I first asked him -- prior to me asking

23   him, he had, he had said -- he mumbled no.

24   Q    Okay.  I just wanted to clear that up.  Thank you.

25        MR. BERRY:  Judge, at this time I'd like to play his

Gomez - direct by Berry

1  body camera video.  And I'd like to enter it into evidence for
2  the Court's consideration as Government Exhibit No. 2.
3                MR. CLAVELLI:  Yes, Your Honor.
4                THE COURT:  Any objection?
5                MR. CLAVELLI:  No objection.
6                THE COURT:  All right.  No objection.  It will be
7  admitted.
8        (Whereupon, Government Exhibit No. 2 was received in
9          evidence.)
10  BY MR. BERRY:
11  Q    And, Officer Gomez, while I'm doing this, can I ask you --
12  let me ask you a question.  When you activate your body camera,
13  does it move backwards?  Does it start recording two minutes
14  before it was activated?
15  A    Yes.
16  Q    And is there any volume in that when that happens?
17  A    No.
18                MR. BERRY:  So for the record, Your Honor, the first
19  two minutes will not have any volume.
20                THE COURT:  The Court understands.
21        (Whereupon, said videotape was played in open court.)
22                MR. BERRY:  And I'll stop right there unless Your
23  Honor would like to see more.
24                THE COURT:  No.
25                MR. CLAVELLI:  I was going to make a request.  Maybe

Gomez - direct by Berry

1   we should do it a few minutes later.  But things happened so

2   fast there after the driver gets out of the car, I thought it

3   might be a good idea to see it again.  Is it possible to do

4   that?

5           THE COURT:  Are you asking for them to do it because

6   you don't want to, you don't want to run it when it's your

7   turn?

8           MR. CLAVELLI:  You know, Judge, when I'm doing it at

9   home, I -- it's, it's easier.

10          THE COURT:  Well, you know what, what I would prefer

11  is if he's almost done, I'm sure Mr. Berry would accommodate

12  you by stepping up and replaying it.

13          MR. CLAVELLI:  You'll do that for me?

14          MR. BERRY:  Yes, no problem.  No problem.

15          THE COURT:  Okay.  Yes.  Instead of us doing it now.

16          MR. BERRY:  That's fine.

17          THE COURT:  Go ahead.  Mr. Berry, do you have any --

18          MR. BERRY:  Can I confer?

19          THE COURT:  Yes, you can confer.

20      (Brief pause.)

21          MR. BERRY:  I have nothing further, Your Honor.

22          THE COURT:  All right.  Nothing further.  All right.

23  So when do you want it played?  Now, Mr. Clavelli, or later

24  when you're questioning?

25          MR. CLAVELLI:  I'll ask a few questions first.

Gomez - cross  by Clavelli

1    THE COURT:  Okay.  Thank you.  Just let us know.

2    CROSS-EXAMINATION

3    BY MR. CLAVELLI:

4    Q    Officer Gomez, you were simply driving on routine patrol

5    when you observed the vehicle with the bright lights on,

6    correct?

7    A    Yes.

8    Q    Was it your decision to pull them over?

9    A    It was both our decisions to pull them over.

10   Q    And did you decide what you were going to do after you

11   pulled the vehicle over?

12   A    Conduct a traffic stop.

13   Q    And did you hear your partner say at some point to roll

14   down the windows?

15   A    Yes.

16   Q    And there was a point right at the beginning of the tape

17   when you're standing -- you're looking through the windshield

18   from the passenger side, isn't that right?

19   A    From my camera that's what it looks like.

20   Q    That's true, from the camera.  And you could see through

21   the windshield into the interior of the car, and you were not

22   blocked by any tint, is that right?

23   A    There was tint on the front passenger side window.

24   Q    Well --

25        THE COURT:  Excuse me.  So we can be real clear, when

Gomez - cross by Clavelli

1  you say the front, the front passenger side window or the front

2  windshield?

3              THE WITNESS:  No.  Just the front passenger side

4  window.

5              THE COURT:  All right.  I think we're all straight

6  now.  Proceed, Mr. Clavelli.

7  BY MR. CLAVELLI:

8  Q    Okay.  And so the driver did not roll down his window to

9  speak to the officer, your partner.  He rolled it down because

10 he was ordered to roll it down, is that what you're saying?

11 A    Can you repeat that.

12 Q    The driver did not roll down his side window to talk to

13 your partner.  He did it only after being ordered to do it, is

14 that right?

15 A    Yes.

16 Q    So you found him not to be cooperative?

17 A    Are you speaking about the driver?

18 Q    Yes.

19 A    Repeat that again, please.

20 Q    I'm going to move on.

21             THE COURT:  All right.

22 BY MR. CLAVELLI:

23 Q    At some point you decided that you were going to take

24 everybody out of the car, is that right?

25 A    They were, they were stopped, and then we had to continue

Gomez - cross  by Clavelli

1   an investigation.

2   Q    You were going to do an investigation?

3   A    There was open alcohol -- there was an open alcohol

4   container inside the vehicle.

5   Q    Have you ever investigated the -- a driver's license or

6   for warrants while the driver actually sat in the vehicle?

7   Have you ever done that?

8   A    When they provide the documents requested.

9   Q    And if you want to do a further check, you have a computer

10  in your car, don't you?

11  A    Yes.

12  Q    And you don't guard the driver while you're using the

13  computer, do you?

14  A    The driver did not provide a driver's license.  We did not

15  know who the driver was.

16         THE COURT:  You're not answering the question.  He

17  asked you a specific question.

18         THE WITNESS:  Can you repeat the question.

19         THE COURT:  Miss McCullough.

20     (Record read.)

21         THE WITNESS:  Yes.

22  BY MR. CLAVELLI:

23  Q    That's your usual procedure?

24  A    Every traffic stop's different.

25  Q    Well, how many traffic stops do you do as a matter of

Gomez - cross  by Clavelli

1  course on your tour?

2  A    Multiple.

3  Q    And would you say that you, you take the drivers out and

4  cuff them as a general course of action?

5  A    Like I stated, every traffic stop's different.

6  Q    And what was different about this traffic stop from any

7  other that you saw?

8  A    The driver did not provide a driver's license.

9  Q    But yet you recall you did not give him a ticket, is that

10  right?

11  A    We documented the stop.

12  Q    You didn't give the driver a ticket, did you, for no

13  license?

14  A    No.

15  Q    You verified he had a license, didn't you?

16  A    Yes.

17  Q    You did that on the computer, right?

18  A    Yes.

19  Q    And you looked for warrants, too, isn't that right?

20  A    Yes.

21  Q    So you cuffed him and patted him down so you could check

22  out his history on your computer, isn't that what you did?

23       MR. BERRY:  Objection, Your Honor.  It's

24  mischaracterizing to say you cuffed him.

25       THE COURT:  Objection's overruled.  It's

Gomez - cross  by Clavelli

1   cross-examination.  Officer, if that's not correct, correct it.

2   Proceed.

3              THE WITNESS:  No.

4   BY MR. CLAVELLI:

5   Q    And what is not correct about that statement?

6   A    My partner did.

7   Q    I see.  Otherwise it's a true statement, correct?

8   A    Yes.

9   Q    So you went to the other side -- or strike that.

10             So when the driver was out of the car and safely

11  secured, you were told to take the passengers out, is that

12  right?

13  A    I was given the okay by my partner.

14  Q    So you knew you were going to take the passengers out even

15  before him giving you any kind of a hand signal, is that right?

16  A    No.

17  Q    Well, what made you want to take the passengers out of the

18  vehicle?

19  A    When my partner informed me that there was an open

20  alcoholic beverage inside the vehicle.

21  Q    So you guys decided you were going to search the vehicle

22  because of that?

23  A    Yes.

24  Q    When did you discuss that?

25  A    We didn't.

Gomez - cross  by Clavelli

1  Q    So what did the partner indicate to you to cause you to

2  take the passenger out of the vehicle?

3  A    He pointed at the alcoholic beverage that was inside the

4  vehicle.

5  Q    He did that earlier, didn't he?

6  A    He did it during the stop.

7  Q    I see.  Now, are you claiming that my client tried to

8  close the window on you?

9  A    It's on the body worn camera video.

10  Q    I beg your pardon?

11  A    Yes.  It's on the camera.

12  Q    Yes, I, I saw the camera, and we're going to look at it in

13  a moment, with the window down; right?

14  A    Yes.

15  Q    Down, not up.  You're saying the window was put up, right?

16  A    Yes.

17  Q    And then you opened the passenger side front door, isn't

18  that right?

19  A    Yes.

20  Q    And you went for your weapon, is that right?

21  A    Yes.

22  Q    And you pointed it at the defendant, is that right?

23  A    Yes.

24  Q    And you pointed it at him because you thought he was

25  dangerous?

Gomez - cross  by Clavelli

1    A    For my safety.

2    Q    Did you think the defendant was dangerous?

3    A    I pointed my weapon for my safety.

4            THE COURT:  That's not the question, Counsel -- I

5    mean, Officer.  Can you answer the question.

6            THE WITNESS:  No.

7    BY MR. CLAVELLI:

8    Q    You had no indication that he was armed at that time,

9    isn't that right?

10   A    No.

11   Q    Or dangerous, isn't that right?

12   A    He was nervous.

13   Q    And you put the gun down when he voluntarily got out,

14   isn't that right?

15   A    Yes.

16   Q    You didn't have to reach in there and grab him, correct?

17   A    No.

18   Q    And you flipped him around so he was facing the driver,

19   isn't that right?

20   A    No.

21   Q    So when a person gets out of the car, they're usually

22   facing the front of the car, aren't they?

23   A    Yes.

24   Q    He's facing the driver, isn't he?

25   A    Yes.

Gomez - cross  by Clavelli

1  Q    Cause you flipped him around, right?

2  A    No.

3          THE COURT:  Okay.  Wait a minute.  I want to know

4  what he's saying yes and no to.

5          MR. CLAVELLI:  All right.  I'm sorry, Judge.

6          THE COURT:  So wait until he finishes the question,

7  Officer, before you answer.  Proceed, Mr. Clavelli.

8  BY MR. CLAVELLI:

9  Q    Okay.  You're denying that you, you turned him around, is

10  that what you're doing?

11  A    Can you repeat that.

12  Q    You are denying that you turned him to face the driver's

13  side of the vehicle?

14  A    Yes.

15  Q    And yet it was your intention to detain him, correct?

16  A    Yeah.

17  Q    And you took out your handcuffs and you started to put

18  them on him, isn't that right?

19  A    No.

20  Q    You reached and you pulled his arms down, isn't that

21  right?

22  A    No.

23  Q    You got right up into his back, right up against him and

24  grabbed his arms and put them -- brought them down to his side,

25  isn't that right?

Gomez - cross  by Clavelli

1   A    No.

2   Q    And he only ran because you were starting to put the

3   handcuffs on him, isn't that right?

4   A    No.

5        MR. CLAVELLI:  Now, Your Honor, I think it would be

6   good if we could see --

7        THE COURT:  Mr. Berry, if you could accommodate Mr.

8   Clavelli.

9        MR. BERRY:  Okay.

10  BY MR. CLAVELLI:

11  Q    By the way, while we're doing this, did you at any time

12  see anybody in that vehicle take a drink of alcohol?

13  A    No.

14  Q    Did you smell alcohol on anybody?

15  A    No.

16     (Whereupon, said videotape was played in open court.)

17       MR. CLAVELLI:  Your Honor, I'm going to ask you to

18  focus on the, the window.  The passenger side --

19       THE COURT:  Okay.

20       MR. CLAVELLI:  -- window on the vehicle it's clearly

21  open.

22       THE COURT:  All right.  Why don't you just --

23       MR. BERRY:  Objection --

24       THE COURT:  Wait.  Objection sustained.  You can't

25  say --

Gomez - cross  by Clavelli

1       MR. CLAVELLI:  We're going to see it.

2       THE COURT:  All right.  Thank you.  Proceed.

3    (Whereupon, said videotape was played in open court.)

4       MR. CLAVELLI:  First of all, you can see it there,

5  but there's even better shots further on.  In other words, it's

6  not tinted.

7       THE COURT:  Okay.  That, that is --

8       MR. CLAVELLI:  You can see right through it.

9       THE COURT:  Mr. Clavelli, I need you not to make

10  arguments while counsel is standing there helping you with the

11  tape.  All right.  It is what it is.  I see it.

12       MR. CLAVELLI:  Okay.

13       THE COURT:  All right.  Proceed.

14    (Whereupon, said videotape was played in open court.)

15       MR. CLAVELLI:  There.  There.

16       THE COURT:  All right.  The Court sees the shots

17  you're speaking of while he's walking past the car with the

18  open door from where he came from.  And go ahead.

19       MR. CLAVELLI:  And I am going to -- I'll ask the

20  officer.

21  BY MR. CLAVELLI:

22  Q    Can you see this, Officer?

23  A    Yes.

24  Q    The driver's door window is down, isn't it?  Right?  Isn't

25  it?

Gomez - cross by Clavelli

1    THE COURT:  The passenger side.

2  BY MR. CLAVELLI:

3  Q    I'm sorry.  The passenger side window.

4  A    It's partially up.

5    THE COURT:  All right.  This was a tinted window,

6  correct?

7    THE WITNESS:  Yes.  You can see the tint.

8    THE COURT:  If the window was tinted, then could we

9  see the grass and the curb from the inside going out?

10    THE WITNESS:  If you, if you look at the bottom of

11  the screen, you see the window partially --

12    THE COURT:  That's not what I'm talking about.  I

13  said is it open, at least a good part of it?

14    THE WITNESS:  Yes.

15    THE COURT:  All right.  Go ahead.  Thank you, Mr.

16  Berry.

17    MR. BERRY:  Thank you.

18  BY MR. CLAVELLI:

19  Q    Did the defendant lock the passenger door?

20  A    No.

21  Q    So you didn't have any trouble opening it, is that right?

22  A    No.

23    MR. CLAVELLI:  Judge, I have no further questions.

24    THE COURT:  All right.  Thank you.  Is there anything

25  else from the government?

Gomez - redirect by Berry

1    MR. BERRY:  Just briefly, Your Honor.

2    THE COURT:  All right.

3    MR. BERRY:  Thank you.

4    REDIRECT EXAMINATION

5 BY MR. BERRY:

6 Q    Officer Gomez, when you first approached the vehicle, you

7 approached on the passenger side of the vehicle, is that right?

8 A    Yes.

9 Q    Was the passenger -- front passenger window all the way up

10 to the top?

11 A    Yes.

12 Q    Was that window tinted?

13 A    Yes.

14 Q    At some point did your partner ask the driver to roll the

15 windows of the vehicle down?

16 A    Yes.

17 Q    Was the front passenger window rolled down?

18 A    Yes.

19 Q    Was it rolled all the way down to the bottom?

20 A    Yes.

21 Q    Was it rolled down to the bottom to the point where you

22 could actually put your hand on the seal, the window seal?

23 A    Yes.

24 Q    As you were standing there talking to the defendant when

25 you asked him to get out of the car, that's what I want to go

Gomez - redirect by Berry

1    to next, okay?

2    A    Uh-huh.

3    Q    You said he rolled the window up, is that right?

4    A    Yes.

5    Q    Did he roll the window all the way up to the top?

6    A    No.

7    Q    Why did, why -- did the window stop rolling up eventually?

8    A    Yes.

9    Q    And why did the window stop rolling up?

10   A    Because I opened the door.

11   Q    So let me ask you this:  When you first approached the

12   defendant's window, did you touch the window with your hand?

13   A    Yes.

14   Q    Was the window all the way down?

15   A    Yes.

16   Q    When you opened the front passenger door to ask the

17   defendant to step out, was the window still all the way down?

18   A    No.

19   Q    Was it rolled up?

20   A    Yes.

21   Q    Was it rolled up to the top?

22   A    No.

23   Q    But it was rolled up?

24   A    Yes.

25           MR. BERRY:  I don't have any further questions, Your

1    Honor?

2              THE COURT:  All right.  Thank you.  Anything on that,

3    Mr. Clavelli?

4              MR. CLAVELLI:  No.

5              THE COURT:  All right.  You may go off.

6         (Witness excused.)

7              MR. CLAVELLI:  Your Honor, may I go downstairs and

8    get my witness?

9              THE COURT:  You know what, we're going to take a

10   five-minute break, and you can go and get your witness.  And

11   how many more do we have, Mr. Clavelli?

12             MR. CLAVELLI:  The defendant and the back seat

13   passenger.

14             THE COURT:  All right.  So, first of all, government,

15   are you done?  You're resting?

16             MR. BERRY:  We are, Your Honor.

17             THE COURT:  All right.

18             MR. BERRY:  The government rests.

19             THE COURT:  All right.  And during the rest, we'll

20   take five minutes or so.  They need to come up to be ready to

21   get going within 10 minutes or less, Mr. Clavelli.  All right?

22   Thank you.

23             MR. CLAVELLI:  Thank you, Judge.

24             MR. BERRY:  Thank you, Your Honor.

25        (Short break taken.)

1    MR. CLAVELLI:  Your Honor, we are cognizant you have

2  a scheduling issue.  Understanding that because --

3    THE COURT:  Okay.  So we don't know what the

4  situation is.  If we have to, we'll -- since he'll be here, if

5  you have time.  They're just an argument.  They're not a

6  hearing like you all are with witnesses.  So we need to take an

7  hour break or 45 minutes to have that.  It's an important

8  hearing, a little bit involved.  But I have it all on paper,

9  and they're just supplementing it with an argument.  So we'll

10  finish this hearing today.  I'll finish both.  I can do it.

11  All right.

12    All right.  They have rested.  Who do you have coming

13  up?  Step up.

14    MR. CLAVELLI:  Miss Henry, please.

15    THE COURT:  Miss Henry, check your phone and make

16  sure it's off.

17    THE WITNESS:  It is.

18    THE COURT:  All right.  Good.

19   LAQUESHA HENRY, DEFENDANT'S WITNESS, DULY SWORN

20    THE COURT:  Wait until he asks each question before

21  you answer.  The court reporter only take down one person at a

22  time.

23    THE WITNESS:  Okay.

24    THE COURT:  All right.  Proceed.

25              DIRECT EXAMINATION

Henry - direct by Clavelli

1   BY MR. CLAVELLI:

2   Q    Would you state your name and spell both your first and

3   last names.

4   A    Laquesha Henry.  Laquesha is L-A-Q-U-E-S-H-A.  Henry,

5   H-E-N-R-Y.

6   Q    Miss Henry, back in July of 2019 were you working with my

7   client, Vonte Stokes?

8   A    Yes, sir.

9   Q    What was the area of the city that you worked at?

10  A    87th Dan Ryan.  I think it's Chatham.

11  Q    87th and the Ryan?

12  A    Yes.

13  Q    That's close enough.

14       THE COURT:  Where were you working?

15       THE WITNESS:  The Firehouse Steak and Lemonade

16  Restaurant.

17       THE COURT:  All right.  Thank you.

18  BY MR. CLAVELLI:

19  Q    And your shift ended somewhere around 2:00 a.m. that, that

20  particular day?

21  A    Yes.  Exactly 2:00 a.m.

22  Q    And you were in a white Mercedes Benz?

23  A    Yes.

24  Q    Who was driving?

25  A    Musab.  It's another co-worker at our job.

Henry - direct by Clavelli

1    Q    And was Mr. Stokes in the vehicle?

2    A    Yes, he was in the passenger.

3    Q    Passenger seat?

4    A    Yes.

5    Q    And where were you three going?

6    A    We were dropping me off first.

7    Q    And then after that?

8    A    Then he was going to drop Vonte off, and then Musab was

9    going to go home.

10   Q    So the driver was bringing the two of you home?

11   A    Yes.

12   Q    And at some point you're driving down I think it's -- I

13   think it was 76th.  I always have to look.

14   A    It was, if it's okay for me to say.

15   Q    And did you notice a police officers' vehicle with its

16   lights on?

17   A    No lights was on.  They was just driving.

18   Q    I'm saying was your vehicle curbed by police officers?

19   A    You say what?  I'm sorry.

20   Q    I'm sorry.  Did the vehicle you were driving in while you

21   were on 76th Street, was it stopped by the Chicago Police?

22   A    Yes.

23   Q    And did you see the officers approach the vehicle?

24   A    Yes.

25   Q    Was there one on each side?

Henry - direct by Clavelli

1  A    Yes.

2  Q    And what was the state of the windows at that time?

3  A    Rolled down so they can communicate.

4  Q    And did you see the police officer on the driver's side

5  speak with the driver of the vehicle?

6  A    Yes.

7  Q    And then what did the driver of the vehicle do?

8  A    He started to look for his insurance and his ID.

9  Q    And where did he look?

10 A    He looked like in the glove department and in the middle

11 of the car.

12 Q    And did he have any documents?  Did he find any documents?

13 A    He found the insurance, but I don't remember him finding

14 his ID or anything, but I remember him finding the insurance.

15 But I don't think it was till like after, so ...

16 Q    Did the police officers at sometime ask him to step out of

17 the vehicle?

18 A    Yes.  Once, once he got to taking like a little minute to

19 find the stuff, he got to asking him to step out the vehicle.

20 Q    And had the driver stopped looking for his driver's

21 license?

22 A    Yes.

23 Q    He did?

24 A    Yes.

25 Q    And did you hear what the police officer said to him?

Henry - direct by Clavelli

1    A    No, not really.

2    Q    And then did you observe the other police officer?

3    A    Yes, I did.

4    Q    By the way, you were sitting in the back seat?

5    A    Yes.  Right behind Vonte.

6    Q    So you were on the passenger side?

7    A    Yes.

8    Q    And you could see the police officer on the passenger

9    side?

10   A    Yes.

11   Q    You could see him through the open window?

12   A    Yes.

13   Q    And could you see him through the windshield also?

14   A    Yeah, I could see him through like my window, you know,

15   from the back.  But -- so but I could see him through both

16   windows, though, but I looking at him like really from my

17   window.

18   Q    All right.  And did you notice at any time in the next few

19   minutes or moments that the passenger side window was raised

20   up?

21   A    No.

22            MR. RUBENSTEIN:  Objection, Judge.  Which, which

23   passenger side window?

24            THE COURT:  Objection sustained.

25            MR. CLAVELLI:  The passenger side window from the

Henry - direct by Clavelli

1    front seat.

2         THE COURT:  And, in fact, it's leading.  So I think

3    you need to ask --

4         MR. CLAVELLI:  I'm sorry, Judge?

5         THE COURT:  This is your witness.  That's leading.

6    BY MR. CLAVELLI:

7    Q    Did you see the window that you state was open closed at

8    any time?

9    A    No.

10   Q    Could you see Mr. Stokes in the front seat?

11   A    Yes.

12   Q    From your observation, was he doing anything?

13   A    No.  He was really just sitting there.

14   Q    Now, who opened the front passenger car?

15   A    The officer.

16   Q    Was there an issue with the front passenger door?

17   A    It was -- the handle was broke, so you can't open it from

18   the inside.  You only can open it from the outside.

19   Q    And have you seen that car recently?

20   A    Yes.  He's -- Musab still work there, so yeah.

21   Q    And is that front passenger door still broken from the

22   inside?

23   A    Yes, till this day.

24   Q    And you're saying it was broken back in July of '19 also?

25   A    Yes, sir.

Henry - direct by Clavelli

1  Q    When -- did you see Vonte Stokes get out of the car?

2  A    Yes, I did.

3  Q    And what happened next?

4  A    He basically tried to get out the car, but the officer got

5  aggressive with him, so he didn't really get nowhere.

6  Q    I'm sorry.  The officer got what?

7  A    Aggressive with him.  So he didn't really get nowhere.

8  Q    I'm going to ask you what you saw.

9  A    Okay.  So I seen him try to get out of the -- no, I'm

10  sorry.  I seent the officer try to open the door.  So once he

11  tried to open the door, that's when he tried to get out.  He

12  tried to like get somewhere, but the officer was like on him.

13  He couldn't get nowhere so ...  After that it's like basically

14  he had his like knee in his back like, you know, try to get him

15  down.  And he -- I don't, I don't remember if he exactly

16  handcuffed him yet, but I know he tried to get -- he got him

17  down on the ground, and I think that is really all I remember

18  when he got him down on the ground.

19  Q    All right.  When the passenger door was open, there is a

20  space between the door and the vehicle itself?

21  A    Uh-hum.

22  Q    You following me?

23  A    Uh-hum.

24          THE COURT:  I need you to say yes or no.

25          THE WITNESS:  I'm sorry.  Yes.

Henry - cross by Rubenstein

1  BY MR. CLAVELLI:

2  Q    Did the police officer step inside of the area where the

3  door would have swung open?

4  A    Yes.  Because he wasn't trying to let him get like

5  nowhere.  He wasn't trying to let Vonte get nowhere.  So soon

6  as the door opened, he like, you know, stepped right there to

7  try to stop him from going anywhere.

8  Q    To the best of your knowledge, were they touching?

9  A    I don't remember.  I'm sorry.

10           MR. CLAVELLI:  I have no further questions.

11           THE COURT:  All right.  Thank you.

12  Cross-examination.

13           MR. RUBENSTEIN:  Yes, Judge.

14                CROSS-EXAMINATION

15  BY MR. RUBENSTEIN:

16  Q    Miss Henry.

17  A    Hi.

18  Q    You said the officer got aggressive with him.  You

19  testified about a number of things that you observed.  Did you

20  observe Mr. Stokes run from the vehicle?

21  A    He didn't -- I wouldn't really say run, but he tried to

22  like get out.  But he couldn't really run because he was

23  already on him, you know what I'm saying?  He was already up

24  close on him, so he couldn't really run.

25  Q    Have you seen any videos of this incident?

Henry - cross by Rubenstein

1    A    I haven't seen the video, no.

2    Q    Mr. Stokes' lawyer hasn't shared any videos with you to

3    refresh your recollection about this incident?

4    A    No.

5    Q    So you didn't see Mr. Stokes get out and run and try to

6    flee the scene?

7    A    He tried to get out.  That's what I'm saying, but he

8    didn't get nowhere.  It wasn't nowhere to go because he was so

9    close on him.

10   Q    I understand.

11            THE COURT:  All right.  Let me just be -- so when you

12   say get out, you mean like get away?

13            THE WITNESS:  Yeah, he did -- that's what I said.  He

14   did try to get out, but he didn't get nowhere.

15            THE COURT:  Get out of the car and get away are two

16   different things.

17            THE WITNESS:  No, I, I didn't say he tried to get

18   away.  I just said he tried to get out, but he couldn't get

19   nowhere because the officer was already up close on him.

20            THE COURT:  All right.  So you're saying he wouldn't

21   have had the opportunity to run?

22            THE WITNESS:  No.  Basically -- I mean, yes.  That's

23   basically what I'm saying.

24            THE COURT:  Okay.

25   BY MR. RUBENSTEIN:

Henry - cross by Rubenstein

1   Q    What's the furthest you saw Mr. Stokes away from that car

2   before he was arrested?

3   A    Maybe -- so we was like parked on the curb.  You know,

4   like once the curb is right there, you know, the grass is right

5   there, that's the -- and then the sidewalk.  That's like the

6   furthest he got.

7   Q    You didn't see him run all the way to where the officers'

8   squad vehicle was?

9   A    No.

10  Q    I notice you have your phone with you today.  I think you

11  may be holding onto that right now.

12  A    Yeah.

13  Q    And you're a -- you're a millennial, is that right?

14  A    Yeah.

15  Q    Do you always have your phone in your hand?

16  A    I always got my phone in my hand.

17  Q    And you had your phone -- in fact, you were looking at

18  your phone throughout this traffic stop?

19  A    Yes, I was.

20  Q    Okay.  And ultimately when the officers ordered you out of

21  the car, you were even talking on your phone, is that right?

22  A    Yes, I was.  I had called my job to let them know what was

23  going on.

24  Q    And, Miss Henry, were you aware that there was an open

25  bottle of alcohol in that car prior to you being ordered out of

Henry - redirect by Clavelli

1   the car?

2   A    No.

3   Q    Did you know that Mr. Stokes had an open bottle of alcohol

4   on his person?

5   A    No.

6   Q    You never observed that?

7   A    No.

8   Q    And just to clarify about the windows.  When you were

9   driving down 76th Street in that car before the car was pulled

10  over, the windows were all up?

11  A    Yes.

12  Q    And it was after you were pulled over, that at some point

13  the driver rolled all those windows down, is that correct?

14  A    Yes.

15          MR. RUBENSTEIN:  One moment, Your Honor.

16      (Brief pause.)

17          MR. RUBENSTEIN:  That's all, Judge.

18          THE COURT:  All right.

19          MR. CLAVELLI:  Your Honor, I beg your pardon.  I, I

20  forgot to ask two questions.

21          THE COURT:  Go ahead.  I'll allow you to go beyond.

22          MR. CLAVELLI:  Thank you.

23          THE COURT:  Any objection to him --

24          MR. RUBENSTEIN:  No, Judge.

25              REDIRECT EXAMINATION

Henry - recross by Rubenstein

1   BY MR. CLAVELLI:

2   Q    At some point after Vonte left the vehicle, were you put

3   in handcuffs?

4   A    Yes, I was.

5   Q    And while you were standing there in handcuffs, did you

6   see the police search the interior of the car?

7   A    Yes.

8   Q    Did you see them search the trunk?

9   A    Yes.

10          MR. CLAVELLI:  No further questions.

11          MR. RUBENSTEIN:  One quick thing, Judge.

12          THE COURT:  Sure, on that.

13                  RECROSS-EXAMINATION

14  BY MR. RUBENSTEIN:

15  Q    Before the officers searched the trunk of the car, did you

16  hear the officers state that they recovered a gun from Mr.

17  Stokes?

18  A    Yes, I did.

19          MR. RUBENSTEIN:  Thank you, Judge.

20          THE COURT:  Anything else?

21          MR. CLAVELLI:  No, Judge.

22          THE COURT:  All right.  You may step down.  Thank

23  you.

24          THE WITNESS:  Thank you.

25      (Witness excused.)

 1          THE COURT:  Off the record.

 2      (Off the record discussion.)

 3          THE COURT:  All right.  We're on the record again.

 4  What's next?

 5          MR. CLAVELLI:  Well, Your Honor, I, I would put the

 6  defendant on.

 7          THE COURT:  Right.  I just don't know what's

 8  happening.  I know we have people who are here for the next

 9  case.  We tried to push it back to 1:30.  That might be why

10  nobody's here for you all.  If so, I want to go ahead and start

11  the -- finish this matter.  We arranged for the time to be

12  pushed back, but we haven't heard from anyone.  All right.  So,

13  you know, let's do this --

14          MR. CLAVELLI:  Your Honor, I --

15          THE COURT:  Wait.  Wait.  We can find out something

16  real fast.

17      (Brief pause.)

18          MR. RUBENSTEIN:  Judge, I think there may be a change

19  in plans.

20          THE COURT:  Oh.

21          MR. CLAVELLI:  I'm just going to go really --

22          THE COURT:  Let's get, let's get going.  Let's do it.

23  All right.  I didn't think it would be a long time, but I

24  didn't want to start --

25          MR. CLAVELLI:  I'm going to skip the front part of

Stokes - direct by Clavelli

1    the normal.

2         THE COURT:  Okay.  All right.  Well, let's have him

3    come up.

4         JAVONTE STOKES, DEFENDANT, DULY SWORN

5         THE COURT:  All right.  Have a seat, Mr. Stokes.  All

6    right.  If you need some water, you can still get it yourself.

7    All right.  And the Kleenex.  Keep your voice up.

8         MR. CLAVELLI:  I can tell you right now you're going

9    to have to speak up.

10        THE WITNESS:  Okay.

11        THE COURT:  Keep your voice up, yes.  I know you got

12   that outside voice.  All right.  Go ahead.

13                    DIRECT EXAMINATION

14   BY MR. CLAVELLI:

15   Q    I'm going to call your attention to the evening that you

16   became arrested.

17   A    Okay.

18   Q    Okay?  Do you recall the officer on the driver's side

19   point to the bottle of open liquor?

20   A    Yes.

21   Q    And did you say anything to him at that time?

22   A    Yeah.  He asked whose it was, and I said it was mine's.

23   Q    You said it was yours?

24   A    Yes.

25   Q    And then you saw the driver taken out of the car?

Stokes - direct by Clavelli

1   A    Yes.

2   Q    And then you were engaged by the police officer on the

3   passenger side at that point, is that right?

4   A    Yes.

5   Q    And did he say anything to you?

6   A    He asked me to step out.

7   Q    And did you say anything to him?

8   A    I said no.

9   Q    And at this point -- somewhere around this point did you

10  make an effort to raise the window?

11  A    No.

12  Q    And --

13          THE COURT:  So the window was already down, sir?

14          THE WITNESS:  Yes.

15          THE COURT:  Go ahead.

16  BY MR. CLAVELLI:

17  Q    What happened next after you told him no?

18  A    He swung the door open, and he --

19  Q    How did the door open?

20  A    He yanked it open.  And he, he upped a gun on me, told me

21  to step out -- or he asked me why I said no.  Then he told me

22  to step out.  And I got out.

23  Q    Was, was his voice raised?

24  A    Yes.

25  Q    And you stepped out, and what did you do then?

Stokes - cross by Berry

1    A    Faced towards the car.  He grabbed my wrist, and that's

2    when I snatched away and tried to run.

3    Q    Did you see handcuffs at any time?

4    A    I didn't see them.  I heard them.

5             MR. CLAVELLI:  All right.  I have no further

6    questions.

7             THE COURT:  All right.

8                        CROSS-EXAMINATION

9    BY MR. BERRY:

10   Q    Mr. Stokes, on July 7th, 2019 at 2:30 in the morning you

11   had a gun in your front right pocket, right?

12   A    Yes.

13   Q    And you knew that gun was in your front right pocket,

14   right?

15   A    Yes.

16   Q    And, in fact, you had previously been convicted of

17   carrying a gun in Cook County, is that correct?

18   A    No.

19   Q    You were -- yes, you were -- let me ask you this:  You

20   were previously convicted of carrying a gun in Calumet City,

21   Illinois prior to July 7th of 2019, correct?

22   A    Yes.

23   Q    And that's in -- Calumet City is in Cook County, correct?

24   A    It was federal.

25   Q    But it's in Cook County, correct?

Stokes - cross by Berry

1  A    Yes.

2  Q    And you were charged in Cook County originally, is that

3  right?

4  A    Yes.

5  Q    And then the case was brought federally, is that right?

6  A    Yes.

7  Q    And you, in fact, pled guilty in front of Judge Lefkow for

8  carrying that firearm, correct?

9  A    Yes.

10 Q    And you knew that you could not carry firearms, is that

11 right?

12 A    Yes.

13 Q    But you still had a firearm in your pocket on that day, is

14 that right?

15 A    Yes.

16 Q    And that firearm had one bullet in the chamber?

17 A    Yes.

18 Q    And you had that on your person as you were in the front

19 of the car that day, right?

20 A    Yes.

21 Q    Now, you say you were coming home from work, correct?

22 A    Yes.

23 Q    And you were sitting in the front passenger seat of that

24 car, correct?

25 A    Yes.

Stokes - cross by Berry

1  Q    And you had worked a full shift that day?

2  A    Yes.

3  Q    And you had an open bottle of alcohol, Remy Martin, next

4  to your left leg while you were in that car; is that right?

5  A    Yes.

6  Q    And as you were driving from Firehouse Steak and Lemonade

7  to where the police pulled you over, the windows of that car

8  were all up, is that right?

9  A    Yes.

10  Q    And you were in a white Mercedes, correct?

11  A    Yes.

12  Q    And is his name Musab, is he driving?

13  A    Yes.

14  Q    And am I correct to spell it M-U-S-S-A-B --

15        THE COURT:  We've got the spelling in front of the

16  court reporter.

17        MR. BERRY:  Thank you, Your Honor.

18        THE COURT:  I anticipated that.

19  BY MR. BERRY:

20  Q    Musab was driving, correct?

21  A    Yes.

22  Q    And Quesha, who just testified, she was sitting in the

23  back passenger seat, correct?

24  A    Yes.

25  Q    Did they know you had the gun on you that day?

Stokes - cross by Berry

1   A     No.

2   Q     Now, when you were pulled over by the police, you knew you

3   had the gun in your pocket, correct?

4   A     Yes.

5   Q     And you knew you couldn't carry that gun, correct?

6   A     Yes.

7   Q     You also knew you had the open bottle of alcohol next to

8   you, correct?

9   A     Yes.

10  Q     One police officer went to the driver's side window, is

11  that right?

12  A     Yes.

13  Q     And Musab rolled that window down, is that correct?

14  A     Yes.

15  Q     And when he rolled that window down, your passenger side

16  window was all the way up, is that right?

17  A     Yes.

18  Q     And there's a tint on that window, correct?

19  A     Yes.

20  Q     And that tint makes it tough, kind of hard to see out or

21  inside the car; is that right?

22  A     Yes.

23  Q     And it was 2:30 in the morning, right?

24  A     Yes.

25  Q     And it's in the 6th District, is that right?

Stokes - cross by Berry

1   A    I believe so.

2   Q    And you at sometime had lived in Englewood in the 7th

3   District before, is that right?

4   A    Yes.

5   Q    And you know --

6          THE COURT:  Where is this going?

7          MR. CLAVELLI:  Your Honor, it's about the area that

8   we're in.

9          THE COURT:  Well, what does that matter for whether

10   or not he --

11          MR. BERRY:  I'm just laying the --

12          THE COURT:  -- was properly stopped.

13          MR. BERRY:  I'll move on.

14          THE COURT:  Please do.

15          MR. BERRY:  Thank you, Your Honor.

16          THE COURT:  Thank you.

17   BY MR. BERRY:

18   Q    Now, as you're in that front passenger seat, the officer

19   asked whose alcohol was that, correct?

20   A    Yes.

21   Q    And you told him it was yours?

22   A    Yes.

23   Q    And you took the bottle and handed it to the officer,

24   correct?

25   A    Yes.

Stokes - cross by Berry

1  Q    The officer asked Musab to roll all the windows down,
2  correct?
3  A    Yes.
4  Q    And the windows were rolled all the way down to the
5  bottom, is that right?
6  A    It was -- yes, it was rolled down to the bottom, but it
7  was like partially still up a little bit.
8  Q    So is it your testimony that when the windows were
9  originally rolled down by Musab, there was still a little bit
10 that was up?
11 A    Yes.  Just a little bit.
12 Q    Okay.  So it would be impossible for an officer to touch
13 the bottom, the -- I guess the frame of the car with his hand,
14 is that what you're saying?
15 A    Probably not impossible because it was -- it was still
16 down like partially.  It just wasn't all the way down.  It was
17 still possible for him to do it.
18 Q    So if someone comes to your window at the time that Musab
19 rolled it all the way down, and they went to touch the window,
20 the area where the windows open, correct?  Follow me?  And they
21 went to touch that, they'd be touching the window, correct,
22 from your testimony?
23 A    It depends on what part of the window that he was
24 touching, 'cause by the windows being down like this,
25 (indicating) if he touched right here, (indicating) he'd be

Stokes - cross by Berry

1    able to do it.  But if he touched the top of it, he'll probably
2    still be partially touching the window.
3    Q    Okay.  So as you're sitting in the car, if the window is
4    partially rolled down, from your perspective the part that's
5    all the way down is further away from you; is that right?
6    A    No.  The part that's all the way down is probably the
7    closest to me.  The window going like this, (indicating).
8                THE COURT:  Excuse me.  I hate to interrupt again.
9                MR. BERRY:  Yes.
10               THE COURT:  Because we're getting really detailed
11   here.
12               MR. BERRY:  I am.
13               THE COURT:  So the question is, we don't have the
14   window all the way up, which was one of the issues before,
15   whether it was not open at all.  Now, he admits they were
16   partial -- at least partially down.  And I'm assuming he's
17   talking about his window.  Is that correct, sir?  You can't
18   really testify as to the other windows, can you?
19               THE WITNESS:  No.
20               THE COURT:  All right.  And so where are we going?
21               MR. BERRY:  I'm just asking which part of the window
22   was up.  Was it the part that's closest towards him --
23   partially up.  The part that's closest towards him or the part
24   that's closest towards the front of the car.
25               THE COURT:  And how does this -- why does that

Stokes - cross by Berry

1    matter?

2            MR. BERRY:  Your Honor, if the video shows that the

3    officer touched a part -- the frame of the car that was closest

4    to him.  It's the officer's testimony that the defendant began

5    to roll up the window after he asked him to get out the car.

6    Defendant's testimony is that he never touched that window.

7    However, if he's saying that the window was partially rolled

8    down in a certain way, the video will contradict his testimony.

9            THE COURT:  On a, on a point that is not exactly the

10   most telling I don't think, but proceed if you believe it's

11   important.

12           MR. BERRY:  Thank you, Your Honor.

13   BY MR. BERRY:

14   Q    Now, the part of the window that's rolled up, right,

15   you're saying that's furthest away from you?

16   A    Yes.

17   Q    Okay.  All right.  Now, the officer asked you to step out

18   of the vehicle.  The officer that's next to you, correct?

19   A    Yes.

20   Q    And you told him no?

21   A    Yes.

22   Q    Meaning you weren't going to step out of that vehicle, is

23   that right?

24   A    No.

25   Q    You were not going to step out of the vehicle?

Stokes - cross by Berry

1   A    No.

2           THE COURT:  All right.  I'm sorry.  We've got two

3   negatives here.

4           MR. BERRY:  I do.

5           THE COURT:  Sir, you just told him no, you didn't

6   want to step out of the vehicle.  That was your plan not to

7   step out, is that correct?

8           THE WITNESS:  Yes.

9           THE COURT:  All right.

10  BY MR. BERRY:

11  Q    So the officer opened the door for you, is that right?

12  A    Yes.

13  Q    Was that door -- do you know if that door was broken or

14  not?

15  A    Yeah, I know the door is broken.

16  Q    Okay.  And so you can't open it from the inside anyway?

17  A    No.

18  Q    But you were -- strike that.

19          The officer opened the door, and he pulled his

20  firearm, is that right?

21  A    Yes.

22  Q    And you stepped out of the vehicle at that point, correct?

23  A    Yes.

24  Q    And you turned yourself around and rose your hands, is

25  that right?

Stokes - cross by Berry

1   A     Yes.

2   Q     The officer didn't turn you around, is that right?

3   A     No.

4   Q     Did the officer turn you around?

5   A     No.

6         THE COURT:  Turn you around in what way?  He was

7   facing the car?

8         MR. BERRY:  Correct.

9         THE COURT:  Were you facing the inside of the car

10  with your front of your body?

11        THE WITNESS:  Yes.

12        THE COURT:  All right.

13  BY MR. BERRY:

14  Q     Did the officer place you in that position?

15  A     No.

16  Q     You did that on your own?

17  A     Yes.

18  Q     And when the officer did that, you ran?

19  A     I ran after he grabbed my wrist.

20  Q     Okay.  So it's your testimony that the officer grabbed

21  your wrist first?

22  A     Yes.

23  Q     And then you ran?

24  A     Yes.

25  Q     But you did run?

Stokes - cross by Berry

1   A    Yes.

2   Q    The officer hadn't had handcuffs on you at that point, did

3   he?

4   A    No.

5   Q    And you ran in one direction, correct?

6   A    Yes.

7   Q    And then you stopped and ran the other direction, correct?

8   A    Yes.

9   Q    And then the officers tackled you and took you down to the

10  ground, correct?

11  A    Yes.

12  Q    And you knew you had that gun in your pocket, right?

13  A    Yes.

14  Q    And you didn't want to be arrested?  Did you want to be

15  arrested?

16  A    No.

17  Q    You fought with the officers?

18  A    Not really no fight.  I just turned my body.  It wasn't no

19  fight.

20  Q    That's a bad word.  You're right.  You resisted the

21  officers?

22         THE COURT:  That's even a worse word.  Objection

23  sustained.  Objection sustained.

24  BY MR. BERRY:

25  Q    Did you let the officers grab your hands to arrest you?

Stokes - redirect by Clavelli

1  A    Not at first.

2  Q    You struggled with them?

3  A    Yes.

4  Q    The officers asked you why you ran, is that right?

5  A    Yes.

6  Q    And you didn't say anything, correct?

7  A    No.

8  Q    But you knew you had that gun in your pocket, right?

9  A    Yes.

10        MR. BERRY:  Give me one second, Your Honor.

11     (Brief pause.)

12        MR. BERRY:  I don't have anything further, Your

13 Honor.

14        THE COURT:  Thank you.  Mr. Clavelli, anything

15 further?

16        MR. CLAVELLI:  Briefly.

17             REDIRECT EXAMINATION

18 BY MR. CLAVELLI:

19 Q    After the driver got out of the car, were you looking at

20 the driver?

21 A    Yes.

22 Q    Did you see him get handcuffed?

23 A    Yes.

24        MR. CLAVELLI:  No further questions.

25        THE COURT:  Anything on that?

1          MR. BERRY:  No, Your Honor.

2          THE COURT:  All right.  He may be seated.  Marshal,

3     thank you.  Thank you, sir.

4          THE WITNESS:  Thank you.

5          THE COURT:  Watch your step.  Be careful going down.

6        (Witness excused.)

7          THE COURT:  Anything else, Mr. Clavelli?

8          MR. CLAVELLI:  Your Honor, I have a situation, which

9     I've already spoken to the government about.  I don't know how

10    to say this.  I'd almost rather say it off the record.

11         THE COURT:  Let's do it off the record then.

12         MR. RUBENSTEIN:  Judge, I don't know a reason to do

13    this off the record.  I understand what Mr. Clavelli is going

14    to raise.  If he wants to raise it, I think it's a -- it's an

15    evidentiary issue.

16         THE COURT:  All right.

17         MR. CLAVELLI:  I would rather do it off the record.

18         THE COURT:  Wait.  Wait.  You know what, we have two

19    things.  There's another choice here.  We can do a side bar.

20         MR. CLAVELLI:  Well, that's what I meant.

21         THE COURT:  And have the white noise on and keep it

22    on the record.  It all depends -- or you know what --

23         MR. CLAVELLI:  Well, it doesn't matter.

24         THE COURT:  Wait.  Wait.  You know what, start this.

25    Mr. Clavelli, if you still want that, we could start it off the

1    record.  Then I can put it on the record if I don't believe it
2    should be off the record.
3                MR. RUBENSTEIN:  That's, that's up to you.
4                MR. CLAVELLI:  All right.
5                THE COURT:  Why don't I do that.  Mr. Clavelli, what
6    do you want to do?
7                MR. CLAVELLI:  Your Honor, I'm in a funny position
8    here.  I have a different recollection of the moment when my
9    client gets out of the vehicle and to when he runs.
10               THE COURT:  Well, you said you have a different
11   recollection?
12               MR. CLAVELLI:  Different recollection.
13               THE COURT:  How do you have a recollection at all?
14   You weren't there.
15               MR. CLAVELLI:  I, I almost find it inexplicable.  But
16   I have said to the government -- the government -- I have
17   the -- I have discs that the government sent me.
18               THE COURT:  Okay.
19               MR. CLAVELLI:  I have said to the government --
20               THE COURT:  You have -- let me just make it real
21   clear.  You have a different recollection of the discs you saw,
22   what was on the discs.
23               MR. CLAVELLI:  Yes.
24               THE COURT:  That's different from saying I have a
25   different recollection of what happened.

1    MR. CLAVELLI:  Well, I'm sorry.  I didn't want to --
2  I don't want to really make --
3    THE COURT:  You can't --
4    MR. CLAVELLI:  -- any accusations.
5    THE COURT:  You can't have, you can't have a
6  recollection because you weren't there.  Of the, of the discs,
7  yes.  Proceed.
8    MR. CLAVELLI:  I've asked the government if I can
9  come by their office with the discs that they gave me.
10    THE COURT:  Okay.
11    MR. CLAVELLI:  And I want to show them this one
12  particular part and compare it to this.
13    THE COURT:  Okay.
14    MR. CLAVELLI:  Now, I don't know.  I can't explain
15  it.  And I'm not going to be making any accusations.  But I
16  would like the opportunity if this particular disc that I have
17  shows something additional than these, to offer that into
18  evidence.
19    THE COURT:  Okay.  And the question the Court would
20  have is, is it something -- there's been a lot of information
21  here that really isn't relevant to the issue at hand.  I mean,
22  I think it's a well-brought motion.  It's properly brought, but
23  there's a lot of extraneous factors that really aren't going to
24  have a bearing on the Court's ruling here.
25    MR. CLAVELLI:  My --

1          THE COURT:  So the question is --

2          MR. CLAVELLI:  My recollection, and I've seen this

3    several times, is that my client gets out of the vehicle.  His

4    left hand is on the roof, his right arm is down.  The police

5    officer is right up, so the body cam does not capture anything

6    from here down, (indicating).

7          THE COURT:  Mr. Clavelli, instead of --

8          MR. CLAVELLI:  When you see the arm come --

9          THE COURT:  I'm sorry.  Mr. Clavelli, I'm sorry to

10   interrupt.  But instead of having you give your argument now,

11   then perhaps you can show the disc you looked at to the

12   government and make that comparison then, and decide whether

13   you want to go forward with that argument.

14         MR. CLAVELLI:  That's what I would like to do.

15         THE COURT:  Let's just -- you can do that.

16         MR. CLAVELLI:  I'm asking to keep the proofs open

17   briefly --

18         THE COURT:  Okay.

19         MR. CLAVELLI:  -- until I can go by the government,

20   and we can talk about this.

21         THE COURT:  As long as you can do it fairly quickly.

22         MR. CLAVELLI:  Oh, sure.  I could do it tomorrow.

23         THE COURT:  All right.

24         MR. RUBENSTEIN:  We told Mr. Clavelli we'd be happy

25   for him to come over and review the disc.

1         THE COURT: Yes. There you go. So we get that done.

2 And then, you know, the Court does not really believe I need

3 arguments. I've got your written -- unless you really feel you

4 need to argue. And I would rather not have paper, but he does

5 have new cases. You do have new cases.

6         MR. RUBENSTEIN: That, that was all, Your Honor.

7         THE COURT: And that would be what he could respond

8 to.

9         MR. CLAVELLI: Well, then why, why don't we -- why

10 don't we argue for 10 minutes then.

11         THE COURT: Now, or later? You want to wait until

12 after --

13         MR. CLAVELLI: Oh, you're giving us the opportunity

14 to argue later. That would be fine.

15         THE COURT: Yes.

16         MR. CLAVELLI: Oh.

17         THE COURT: I mean, you want to go look at the, the

18 tapes.

19         MR. CLAVELLI: Oh, sure.

20         THE COURT: It doesn't makes sense to do an argument

21 now if you want to see the difference.

22         MR. CLAVELLI: Oh, all right. Okay. Well, then,

23 Judge, why don't we set it down for -- it's only going to be a

24 short period of time.

25         THE COURT: Yes. Yvette, can you find us a spot on

1    any date before we get back into --

2              MR. CLAVELLI:  And I, I don't know want to argue for

3    more than 15 minutes.

4              THE COURT:  I'm sorry.  Well -- oh, 15?

5              MR. CLAVELLI:  Less huh?

6              THE COURT:  Yes.  All right.  10 each would be good.

7    But also the Court -- if you have some -- you want to respond

8    with other cases, you want to respond in writing to the case

9    law, I'll give you that opportunity too before we set the

10   argument.  Okay?

11             MR. CLAVELLI:  All right.

12             THE COURT:  All right.  Let's get a date.  Next week

13   is better, Yvette?

14             THE CLERK:  Yes.

15             THE COURT:  So next week is better.  Is anybody on

16   trial next week?

17             MR. BERRY:  I am not.

18             THE COURT:  No?  All right.  Give us a date, Yvette.

19   Not at lunchtime.

20             THE CLERK:  How about March 12th?

21             THE COURT:  How's March 12th everybody?

22             MR. RUBENSTEIN:  Other -- I have a 9:00 a.m. status.

23   Other than that --

24             THE COURT:  Well, I have 9:00 a.m. cases too.  I know

25   I have that.  So we're not --

1           MR. RUBENSTEIN:  Otherwise --

2           MR. BERRY:  I'm fine.  The government is fine with

3    that.

4           THE COURT:  What time is our best time?

5           THE CLERK:  9:30 or 10.

6           THE COURT:  9:30, no.  No.  No.  10?  10.  Let's do

7    10:00 o'clock.  Oh, at 10:30 I have Reavis.

8           THE CLERK:  Yes.

9           THE COURT:  So let's do -- I'm sorry.  Let's do 9:45.

10          THE CLERK:  Okay.

11          THE COURT:  9:45 on March 12th.  Do we need to

12   extend -- government exclude time to  that date?

13          MR. BERRY:  Yes, Your Honor.

14          THE COURT:  All right.

15          MR. BERRY:  At this time the government -- well, yes,

16   I'll make the motion.  The government makes a motion to exclude

17   time in the interest of justice.  This is defense counsel's

18   motion.  And it's for the continuance of the hearing.

19          THE COURT:  Yes.  So he won't be objecting because it

20   is his motion to be able to have this --

21          MR. CLAVELLI:  I don't be object anyway.

22          THE COURT:  -- additional time, so -- and the Court

23   notes that.  And so in addition to March 12th, you should be

24   able to get those -- see the discs.  And actually, Mr.

25   Clavelli, the Court -- you should be able to address -- you can

 1  address it in writing right away, and then the government will

 2  have like two days to be able to respond.  Or you can address

 3  the case law in court.  So whichever is easiest.

 4          MR. CLAVELLI:  The government has given me some

 5  cases.  I haven't read them, but I'm probably going to want to

 6  distinguish them.  Why don't I do that in writing.

 7          THE COURT:  Okay.  If you do it in writing, then

 8  we're going to change that date.  What's the next week after

 9  that that we have, Yvette, open to do a hearing for about --

10  arguments for about 30 -- no more than 45 minutes total?  Do we

11  have something the next week, or are we on trial?

12          THE CLERK:  No, we're not on trial.

13          THE COURT:  Okay.  So March -- the week of

14  March 16th, what do we have?

15          THE CLERK:  We've got the 17th is open.

16          THE COURT:  March 17th.

17          MR. BERRY:  I have a suppression hearing on that day

18  in front of Judge Dow.

19          THE COURT:  All right.  What else do we have, Yvette?

20  We just need the same amount of time that we just had.

21          THE CLERK:  Yes.

22          THE COURT:  Oh, we can do -- let's do, what is it,

23  10:30.  You see it?

24          THE CLERK:  On the 18th?

25          THE COURT:  On the 18th.

1    THE CLERK:  Yes.

2    THE COURT:  Yes.  10:30 on the 18th.

3    MR. BERRY:  That works for the government, Your

4 Honor.

5    THE COURT:  All right.  And by then, Mr. Clavelli,

6 you make sure you have any written responses.  Make sure

7 they're done by the 10th if you have any writing that you want

8 to do.  And can we keep it seven pages.

9    MR. CLAVELLI:  Yes.

10    THE COURT:  All right.  And government make sure your

11 reply is by -- or response to his case distinguishing, if he

12 has to do that, is the 13th.  Friday, the 13th.  March 13th to

13 get it in.

14    MR. BERRY:  That's fine, Your Honor.

15    THE COURT:  All right.

16    MR. RUBENSTEIN:  Judge, is it -- I'm sorry.  On the

17 18th I have a change of plea at 11.  Is it possible to move it

18 up to like 10:15 even?

19    THE COURT:  Hold on a second.  10:15.  Right now if

20 we can move that status, Yvette.  See if we can move that

21 status.

22    THE CLERK:  All right.

23    THE COURT:  See if we can move that status up to

24 9:45.

25    MR. RUBENSTEIN:  Thank you, Your Honor.

1          THE COURT:  I think it was actually there because

2  they wanted to have a, a chance at doing a change of plea.

3          THE CLERK:  Yes.

4          THE COURT:  But they haven't said anything yet.  All

5  right.

6          MR. BERRY:  Would you like the discs now, or would

7  you like us to hold them until -- the body camera that was

8  admitted into evidence.  Would you like us to hold them until

9  the conclusion?

10          THE COURT:  Well, I mean, you've got copies of them

11  to compare --

12          MR. BERRY:  I do.  I have plenty of copies.

13          THE COURT:  Then we'll go ahead and take them.

14          MR. BERRY:  Thank you, Your Honor.

15          THE COURT:  Yes.  They're in the evidence.  All

16  right.  We just need to make sure that these are the -- we will

17  separate them from whatever else he decides to give us.  All

18  right.

19          MR. BERRY:  Thank you, Your Honor.

20          THE COURT:  If there's some difference that's

21  supposed to be, we have enough time to address it then.

22  Actually you know what, let's do this:  I want to make sure

23  about that Reyes case.  Let's do 11.  All right.  So if we move

24  him up, then we'll have plenty of time.  We'll do 11:00.  We

25  don't need more than an hour on this case to wind it up.  Okay?

1  Is that fine?

2          MR. RUBENSTEIN:  I'm sorry, Judge.

3          THE COURT:  11:00 on the 18th.

4          MR. RUBENSTEIN:  That's when my change of plea is.

5          THE COURT:  Oh, I thought you said it was earlier.

6  Oh, okay.  I'm sorry.  Yes, then we'll go back to doing it at

7  10.

8          MR. RUBENSTEIN:  10:00 would be great.  Thank you,

9  Judge.

10          THE COURT:  All right.  Anything else?

11          MR. BERRY:  Nothing from the government.

12          THE COURT:  All right.  Thank you.

13          DEFENDANT STOKES:  Thank you.

14          MR. CLAVELLI:  Thank you, Judge.

15          THE COURT:  All right.  Thank you, Mr. Stokes.  We'll

16  see you in a few weeks.

17      (Whereupon, said hearing was recessed at 12:55 p.m., to

18       reconvene on 03/18/2020, at 10:00 a.m..)

19

20

21

22

23

24

25

1                              CERTIFICATE

2              I HEREBY CERTIFY that the foregoing is a true,

3     correct and complete transcript of the proceedings had at the

4     hearing of the aforementioned cause on the day and date hereof.

5

6     /s/TRACEY D. McCULLOUGH                    December 11, 2020

7     Official Court Reporter                              Date
      United States District Court
8     Northern District of Illinois
      Eastern Division
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25